BERRY PETROLEUM COMPANY AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 28578–91.　　　　Filed May 22, 1995.

*Gerard J. Kenny, Scott M. Knutson,* and *J. Michael Brennan,* for petitioner.

*Jeffrey L. Heinkel, Barbara M. Leonard,* and *Michael Steiner,* for respondent.

## CONTENTS

Page

OVERVIEW OF ISSUES AND CONCLUSIONS ................................ 587

I. GENERAL FINDINGS OF FACT ................................ 588

II. ISSUES 1 AND 2: LOSS CLAIMED ON EXPIRATION OF
AFEX OPTION AND DEDUCTIBILITY OF WIEGAND
LITIGATION COSTS ........................................................ 588

A. FINDINGS OF FACT ................................................ 588
1. Afex Option ................................................ 588
2. Wiegand Litigation ................................................ 601
3. Ultimate Findings of Fact ........................................ 608
B. OPINION ................................................................ 609
1. Afex Option ................................................ 609
a. Respondent's Motion To Strike Mr. Hoffman's Testimony ... 609
b. Disallowance of Loss Claimed on Expiration of Afex
Option and Allocation of Ostensible Price of Afex Option
to Petitioner's Cost of Norris Stock ........................ 611
i. Lack of Economic Substance of Afex Option under Valu-
ation Analysis ........................................ 611
ii. Substance v. Form ................................................ 614
2. Disallowance of Current Deduction for Wiegand Litigation
Costs ................................................................ 617

III. ISSUE 3: EFFECTS OF SECTION 382 ON USEFULNESS OF
NET OPERATING LOSS CARRYOVERS .................................... 622

A. FINDINGS OF FACT ................................................ 622
1. General Findings of Fact ........................................ 622
2. Ultimate Findings of Fact ........................................ 631
B. OPINION ................................................................ 631
1. Background ................................................ 631
2. Section 382—Net Operating Loss Carryovers Generally ......... 632
3. Continuity of Business Enterprise—Section 382(c)(1) ............ 635
4. Fair Market Value of Teorco .................................... 637
5. Redemption or Other Corporate Contraction—Section
382(e)(2) ................................................ 640
6. Substantial Nonbusiness Assets—Section 382(l)(4) ................ 644

BEGHE, *Judge:* Respondent determined deficiencies of $662,013, $126,693, and $366,536 in petitioner's Federal income tax for 1987, 1988, and 1989, respectively.

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

## OVERVIEW OF ISSUES AND CONCLUSIONS

Some issues have been settled, including the deductibility of certain expenses of preparing a registration statement for a postponed public offering of petitioner's stock. The issues remaining for decision are the "Afex option" issue, the "Wiegand litigation" issue, and the "section 382" issue.

The Afex option issue concerns the deductibility of the $1.2 million ostensibly paid by petitioner to acquire an option that expired unexercised in 1987 to purchase certain Oklahoma gas leases. We hold the claimed loss nondeductible because we find that the payment to acquire the option was in fact part of the purchase price of 80 percent of the stock of a corporation (Norris) acquired by petitioner in the same transaction as the option and from the same interests that granted the option.

The Wiegand litigation issue concerns whether petitioner may currently deduct as ordinary and necessary trade or business expenses the costs of defending a class action lawsuit for breach of fiduciary duty brought on behalf of the minority shareholders of Norris who sold their stock on the public market following petitioner's acquisition of control of Norris (selling class) or who exchanged their Norris stock for petitioner's stock in the merger in which Norris became a wholly owned subsidiary of petitioner (merger class). We find that the Wiegand litigation had its origins in petitioner's acquisition of the Norris stock, and hold that petitioner's costs to defend the Wiegand litigation are not deductible.

The section 382 issue concerns the section 382 limitation on the consolidated postacquisition annual taxable income of petitioner's affiliated group that may be offset by the preacquisition loss carryovers of an acquired corporation (Teorco). Our conclusions on the section 382 issue have the effect of substantially reducing, but not eliminating, the annual consolidated taxable income that petitioner claimed could be offset by Teorco's preacquisition net operating loss carryovers.

I. GENERAL FINDINGS OF FACT

The parties have stipulated some of the facts, and the stipulations of fact and exhibits thereto are incorporated in our findings of fact.

At all relevant times, Berry Petroleum Co. (Berry or petitioner) was a Delaware corporation, maintaining its principal office in Taft, California. For 1987, 1988, and 1989, petitioner filed Federal consolidated income tax returns, including thereon its subsidiary, Bush Oil Co. (Bush), previously known as Norris Oil Co. (Norris). On the 1988 and 1989 returns, C.J. Co., a wholly owned subsidiary of Bush whose stock had been purchased by Bush in 1988, was also included.

At all relevant times, Norris/Bush had only one class of outstanding capital stock, designated as common stock. Effective December 1, 1986, petitioner purchased 80.56 percent of the stock of Norris from ABEG Hydrocarbons, Inc. (ABEG). Effective June 26, 1987, petitioner acquired the remaining Norris stock, and Norris became a wholly owned subsidiary of petitioner when a new, wholly owned subsidiary of petitioner was merged into Norris. Immediately after the merger, Norris changed its name to Bush.

At all relevant times, Harvey L. Bryant was president, chief executive officer, and a member of the board of directors of petitioner, and Jerry V. Hoffman was petitioner's vice president and chief financial officer.

II. ISSUES 1 AND 2: LOSS CLAIMED ON EXPIRATION OF AFEX OPTION AND DEDUCTIBILITY OF WIEGAND LITIGATION COSTS

A. FINDINGS OF FACT

1. *Afex Option*

ABEG was a Nevada corporation 100-percent owned by an Australian entity (Entrad, wholly owned by Abraham Goldberg) engaged in real estate development, textiles, and the oil and gas business. American Frontier Exploration, Inc. (Afex), a Delaware corporation, was a wholly owned subsidiary of ABEG engaged in the oil and gas business.

Joseph Stanley Dorobek II was president of both ABEG and Afex until they ceased to exist in 1990, and was also president of Norris until December 1, 1986.

As early as 1983, petitioner had been aware of Norris and had become interested in acquiring Norris' principal asset, Rincon. Rincon consisted of four leases of certain oil-producing properties located in the Rincon field in coastal waters off the coast of Ventura County, California.[1] At some time in 1983 or 1984, petitioner had contacted Norris and discussed the possibility of merging Norris and petitioner, but no action was taken at that time.

Prior to March 1, 1986, ABEG had acquired approximately 42 percent of the issued and outstanding common stock of Norris and had thereby become its largest single shareholder. As a result of Norris' financial difficulties, ABEG and Norris negotiated a financial restructuring during the first half of 1986 under which Norris issued an additional 8,266,666 shares of Norris common stock to ABEG; ABEG in return paid Norris' principal lender $1,750,000 in satisfaction of an indebtedness of Norris, paid the California State Lands Commission $1 million to provide a sinking fund that would allow Norris to preserve its rights to Rincon, and reduced by $350,000 aggregate debt of $3,002,700 owed by Norris to ABEG. The restructuring became effective on June 30, 1986, and ABEG's aggregate payments of $3.1 million for the 8,266,666 Norris shares represented a per-share consideration of $0.375. At that point, ABEG owned 10,097,616 out of a total of 12,596,884 outstanding shares of Norris stock, or 80.16 percent. During July 1986, ABEG purchased an additional 50,000 shares of Norris stock (raising its total Norris holdings to 10,147,616 shares, or 80.56 percent) at a per-share price of $0.33.

In late March 1986, petitioner approached Norris' management to discuss a merger or other combination under which petitioner would acquire at least 80 percent of the Norris stock in exchange for shares of petitioner's common stock. Petitioner initiated this approach as a result of publicity concerning Norris' negotiations with its principal lender and the California State Lands Commission. Mr. Hoffman had been familiar with the Rincon field for some time, and Mr.

---

[1] Rincon was geologically divided into two zones, a shallow zone, which was producing but needed to be reworked, and a deep zone, which was undeveloped but was believed to have great potential. Norris' rights were limited by an option held by ARCO on the rights to the deep zone of one Rincon lease until June 1, 1987. ARCO was required to notify Norris of its intent to drill by Dec. 1, 1986, or the option would become void, and the rights to the deep zone would revert to Norris.

Bryant had tracked the publicly available information. Norris and ABEG rejected petitioner's initial proposal for a stock-for-stock deal. At the time of petitioner's initial approach, ABEG still intended to conduct gas and oil operations through Norris and Afex.

Petitioner continued to seek a merger with Norris. On April 15, 1986, Mr. Hoffman sent a letter to Mr. Goldberg restating petitioner's desire to acquire ABEG's Norris stock in exchange for stock in petitioner. On or about July 24, 1986, Mr. Dorobek, on instructions from Mr. Goldberg, met Messrs. Bryant and Hoffman to discuss petitioner's possible acquisition of Norris. The negotiations which began at this time continued until late September 1986, when petitioner and ABEG entered into an agreement in principle whereby petitioner would acquire all of ABEG's Norris stock for cash.

Petitioner's first written offer for Norris, dated August 25, 1986, was for a merger in which petitioner, in exchange for the issuance of its own common stock, would acquire all of the stock of Norris. The approximate total value of the shares in petitioner that ABEG would have received under petitioner's first offer was $5–6 million, a value of approximately $.50–$.60 per share of ABEG's Norris stock. After showing initial interest in the offer, Mr. Dorobek, on September 18, 1986, informed petitioner that ABEG did not wish to continue its involvement in Norris' business, and that a stock-for-stock exchange, as opposed to a cash sale, was therefore unacceptable.

In the meantime, on September 9, 1986, Mr. Hoffman had consulted with petitioner's attorneys, and on September 12, 1986, petitioner's board of directors had met and authorized petitioner's management to negotiate with Norris. As early as September 12, 1986, petitioner had intended to form a partnership or joint venture to develop Rincon. Immediately after hearing from Mr. Dorobek of ABEG's rejection of the stock-for-stock deal, Mr. Hoffman and Mr. Bryant discussed a cash purchase. They decided petitioner would be willing to pay approximately $5 million in cash for ABEG's Norris stock, amounting to a price of $.493 per share. On September 18, 1986, Mr. Hoffman telephoned Mr. Dorobek and informed him that petitioner was willing to buy ABEG's Norris stock for $5 million in cash.

On September 22, 1986, Mr. Dorobek contacted Mr. Hoffman by telephone and informed him that ABEG was subject to the short-swing profits provisions of the Securities Exchange Act of 1934, ch. 404, sec. 16(b), 48 Stat. 881, 896 (current version at 15 U.S.C. sec. 78p(b) (1988)) (hereinafter section 16(b)), and that any profits realized by ABEG on its sale within 6 months of the additional shares of Norris, which it had purchased on June 30, 1986, and thereafter, might be recoverable by Norris. Against this background, Mr. Dorobek told Mr. Hoffman that ABEG was willing to sell its Norris stock for $3.8 million in cash ($.374 per share) if petitioner would agree to purchase an option (the Afex option) on certain gas properties owned by Afex in Oklahoma (the Afex properties). Despite the introduction of the Afex option proposal at this late point in the negotiations, Mr. Hoffman promptly indicated preliminary agreement to the proposal.

On September 24, 1986, ABEG faxed petitioner an agreement in principle outlining the terms of the purchase by petitioner of ABEG's Norris stock for $3.8 million subject to the negotiation of a definitive agreement and the satisfaction of certain other conditions, including petitioner's guarantee of Norris' "approximately $2,800,000" debt to ABEG. This proposal included a provision that would have attempted to solve the section 16(b) problem by increasing the purchase price of the stock by any amount that ABEG would be required to pay to Norris under section 16(b), but this legally problematical provision was crossed out. ABEG also faxed petitioner a separate "Agreement #2—Option" by which petitioner would agree to purchase the Afex option for a non-refundable payment of $1.2 million; the full sale price of the Afex properties was to be $10,715,215 (less the $1.2 million paid for the option, so that the exercise price would be $9,515,215), and the option was to remain in effect until March 31, 1987. The prices to be paid for the Afex option and its exercise were ostensibly based on "5 years production and the 10% discounted net cash flow of the proved reserves" of these wells. ABEG also faxed a reserve report by Geological Engineering Consultants, Inc., documenting the valuation of $10,715,215 as of June 30, 1986 (GEC reserve report). On September 26, 1986, petitioner accepted ABEG's proposal under the first agreement faxed on September 24.

From September 24 to September 29, 1986, Messrs. Hoffman and Dorobek negotiated the terms of the Afex option. On September 29, 1986, petitioner and Afex executed an agreement in principle under which petitioner was to make a $1.2 million nonrefundable cash payment to Afex, in exchange for the right extending over a year to purchase the Afex properties for a total consideration of $8,162,000, inclusive of the $1.2 million (so that the exercise price would be $6,962,000). The only term that remained unchanged from ABEG's initial proposal was the purchase price for the Afex option of $1.2 million, the difference between petitioner's initial cash offer of $5 million for ABEG's Norris stock and the $3.8 million agreed cash payment for ABEG's Norris shares.

As of October 6, 1986, ARCO had not shown any interest in exercising its option on Rincon, and petitioner's management believed that ARCO would not exercise its option. This belief proved accurate, inasmuch as ARCO did not notify Norris of an intent to drill or otherwise exercise the option before its expiration.

Petitioner was concerned that a competitor might purchase ABEG's Norris stock before petitioner's purchase could be finalized and was therefore pushing hard to complete the transaction. On October 6, 1986, petitioner's board met and authorized management to negotiate definitive agreements for the purchase of ABEG's Norris stock and the Afex option. At that meeting, petitioner's management outlined a plan to acquire the remaining shares of Norris in early 1987 by means of a "second step" merger. Petitioner's board took no immediate action on that plan. Petitioner's management also informed petitioner's board that there were two companies interested in acquiring a working interest in Rincon after "the transaction is completed."

On October 8 and November 5, 1986, the closing date for petitioner's purchase of ABEG's Norris shares (and the Afex option) was extended by agreement. On October 10, 1986, Mr. Hoffman met with Dennis Hayes of Arthur Young & Co. to discuss Norris' net operating losses and to begin a tax analysis, which Arthur Young was asked to complete. On October 15, 1986, Messrs. Hoffman and Bryant met with the California State Lands Commission to discuss the operation of the Rincon field. During October and November 1986, there were numerous telephone calls between petitioner's

and Norris' management and counsel to negotiate the definitive stock purchase agreement and Afex option and to conduct petitioner's due diligence investigation of Norris. Prior to December 1, 1986, Messrs. Hoffman and Bryant informed petitioner's board of directors that, because of the section 16(b) problem, the only way petitioner could buy the Norris stock was to structure the transaction in the form presented by ABEG, using the Afex option.

On December 1, 1986, the definitive agreements for petitioner's purchase of ABEG's Norris stock and the Afex option were signed, and both transactions closed on that date. Under the final terms of the agreements, petitioner paid $3.8 million for ABEG's 10,147,616 shares of Norris stock, guaranteed Norris' debt of $2,675,577.92 to ABEG, and paid $1.2 million for the Afex option, which was to be exercisable over the following year for an exercise price of $6,962,000.[2]

On December 1, 1986, the bid price for shares of Norris in the over-the-counter market was $.50 per share. At this price, ABEG's 10,147,616 shares of Norris were worth $5,073,808. The $3.8 million price that petitioner ostensibly paid for the Norris stock represents $.374 per share, which, if given effect, would have eliminated the section 16(b) problem.

Immediately after petitioner purchased ABEG's 10,147,616 shares of Norris stock, the remaining 2,449,268 shares (19.44 percent) (Norris minority stock) were widely held and publicly traded in the over-the-counter market. The headquarters of Norris and petitioner were combined, and petitioner assumed all administrative functions of Norris, including the preparation and dissemination of financial statements, Securities and Exchange Commission (SEC) filings, shareholder communications, and press releases. On December 2, 1986, a new board of directors of Norris was appointed. All members of the Norris board were either members of petitioner's board, or shareholders of petitioner, or both. On the same day, December 2, 1986, petitioner issued a press release announcing its purchase of the Norris

---

[2] The executed agreement specifies Nov. 15, 1987, as the expiration date of the Afex option, whereas the Norris proxy/Berry prospectus specifies Nov. 30, 1987, as the expiration date.

stock and the appointment of new Norris officers and directors.

On or about December 9, 1986, Norris filed a schedule 13D with the SEC. The schedule 13D stated that petitioner had acquired ABEG's Norris stock with the intention of exploring and developing Norris' oil and gas reserves. The schedule also stated that "Berry may purchase or otherwise acquire additional securities of Norris in the future, however, it has not formulated any purchase or acquisition proposals at this time."

On December 12, 1986, petitioner's board held a meeting. At that time, petitioner intended to sell a working interest in Rincon "after the Norris reorganization is completed." Petitioner's management told petitioner's board that in early 1987 petitioner would make presentations to three potential purchasers.[3] Petitioner's management also told petitioner's board that it "will be asked to approve a plan of reorganization of Norris, by which Berry Petroleum Co. will become a public company." Although Norris sent the Norris minority shareholders a letter and report dated December 15, 1986, neither the sale of an interest in Rincon nor the reorganization was mentioned in the letter or the report.

During December 1986, petitioner had discussed with Exxon the possibility of swapping a 50-percent interest in Rincon for a 50-percent interest in another oil-producing property that a third party had purchased in January 1986 for $85 million.

In a memorandum dated January 12, 1987, petitioner's management informed petitioner's board of its plan to sell a 50-percent interest in Rincon to another company that would become a partner in the development of Rincon. The memorandum stated that petitioner would need to acquire the Norris minority stock prior to the sale of an interest in Rincon so as to ensure that the price of the Norris minority stock would not be increased. On or about February 18, 1987, Mr. Bryant sent a copy of the January 12 memorandum to a major shareholder of petitioner. The January 12 memorandum was not otherwise distributed outside of petitioner's board.

---

[3] Ultimately, 10 companies were contacted or given presentations about Rincon.

In a letter dated January 27, 1987, to the California State Lands Commission, Mr. Bryant stated that

preliminary budget-type estimates indicate at least $60,000,000 will be needed to recover the remaining proved reserves and develop the reserves that additional drilling will prove up. Our lenders are extremely hesitant to lend us these amounts in spite of the strong financial position of Berry Petroleum Co. due to the short-term [sic] of the present royalty schedule— 5 years commencing July 1, 1986.[4] We are asking that you and your staff recommend to the State Lands Commission that the term of the present royalty schedule be extended from 5 years to 20 years.

If the State Lands Commission had extended the royalty schedule at that time, the value of Norris and the Norris minority stock would probably have increased significantly. During the next few months, Mr. Bryant attended meetings with the State Lands Commission and its staff and renewed his request for an extension of the royalty schedule. The State Lands Commission granted the royalty extension request on September 23, 1987, 3 months after the reverse merger by which petitioner acquired the Norris minority stock.

On January 30, 1987, petitioner's board met and authorized petitioner's management to negotiate the reverse merger. The exchange values of Norris and petitioner as of March 1, 1987, were to be established by independent petroleum engineers, and the exchange ratio was to be based on those values. Also included in the exchange value of Norris (and therefore in the exchange ratio) were the tax benefits of Norris' net operating loss carryovers and investment tax credit carryovers. These carryovers were estimated to be $8.3 million and $200,000, respectively. The value of the tax benefit of the carryovers was calculated to be approximately 15 percent of the carryovers, $1.3 million.

The Norris board did not hire independent legal counsel to represent Norris, appoint a committee of independent directors to negotiate with petitioner or to evaluate the fairness of the merger, or make the merger subject to a majority vote by the Norris minority shareholders. However, Wedbush Securities, Inc., was hired to issue a fairness opinion on the exchange ratio.

---

[4] Norris had been granted a temporary, reduced-rate royalty schedule.

Petitioner and Exxon entered a confidentiality agreement dated February 4, 1987, which was to protect information that Exxon provided to petitioner regarding a lease that was located 4 to 5 miles away from Rincon.

On March 3, 1987, Norris announced that the boards of Norris and petitioner had authorized their respective managements to negotiate a merger agreement. Norris also announced that its estimates of proved developed and undeveloped oil reserves were reduced from 1,576,000 barrels at December 31, 1985, to 112,000 barrels at March 1987, and that its estimates of proved developed and undeveloped gas reserves were reduced from 20,473 million cubic feet at December 31, 1985, to 9,032 million cubic feet at December 31, 1986.

On March 19, 1987, Norris announced that it had suffered a net loss of $13,191,500 ($1.55 per share) for 1986 as compared to a net loss of $2,254,900 ($.52 per share) for 1985.

On March 20, 1987, the boards of directors of petitioner and Norris discussed at length whether Norris had a claim against ABEG for section 16(b) short-swing profits. On "advice of counsel and management", no action to assert any rights of Norris against ABEG under section 16(b) was ever taken by Norris. The short-swing profits were not valued in the exchange ratio calculated for the merger of Norris and petitioner that occurred on June 26, 1987.

On April 7, 1987, the boards of Norris and petitioner held separate meetings at which each board approved an agreement of merger and an exchange ratio. The agreement of merger stated that Norris was to become a wholly owned subsidiary of petitioner by means of a reverse merger in which a newly formed, wholly owned subsidiary of petitioner, Berry Acquisition Corp., would merge into Norris. The approved exchange ratio was .0333 share of petitioner's stock for each share of Norris stock, and was based on an exchange value of $.50 per share of Norris and $15 per share of petitioner. The most significant components of the calculation of the exchange ratio were the fair market values of the oil and gas reserves of the respective companies. The fair market value of Rincon's reserves on March 1, 1987, was estimated to be $2.2 million. This estimate did not include any value for the deep zone of Rincon.

On April 27, 1987, petitioner presented a proposal to Tenneco for a joint venture to develop Rincon. By letter dated May 29, 1987, Tenneco expressed an interest in the proposal, and on May 31, 1987, petitioner and Tenneco entered a confidentiality agreement. Tenneco began a preliminary investigation of Rincon on April 27, 1987, but was not given access to Norris' records until the day after the merger proxy and prospectus were issued. Tenneco continued to investigate Rincon until sometime after June 26, 1987.

A proxy statement and prospectus, dated June 3, 1987 (Norris proxy/Berry prospectus), were mailed to the owners of the Norris minority stock. The Norris proxy/Berry prospectus explained the structuring of ABEG's sale of stock and described the Afex option as follows:

> During the course of negotiations, ABEG expressed concernts [sic] that, since it was subject to the "short-swing" profit recovery provisions of Section 16(b) of the Exchange Act, any profit it made on the sale of the approximately 8.2 million shares which it purchased as of June 30, 1986 from Norris might be recoverable by Norris if such shares were sold within a six month period. In light of this fact, ABEG informed Berry that it was willing to sell its Norris shares for $3.8 million ($.374 for each Norris share) if Berry also agreed to purchase the AFEX Option described below. Because of Berry's continuing needs for a dependable long-term source of natural gas for its enhanced oil recovery operations, Berry agreed to purchase the AFEX Option on the terms described below.
>
> On September 29, 1986 Berry entered into an agreement in principle with American Frontier Exploration, Inc., a wholly-owned subsidiary of ABEG, ("AFEX"), whereby Berry would purchase an option covering certain Oklahoma natural gas wells owned by AFEX. On December 1, 1986, Berry entered into a definitive Option Agreement with AFEX pursuant to which AFEX granted to Berry, for an option price of $1.2 million, the sole right to purchase (the "AFEX Option") such natural gas wells for an aggregate purchase price of $8,162,000, to be reduced upon exercise of the AFEX Option by the $1.2 million option price paid by Berry under the Option Agreement. The AFEX Option continues until November 30, 1987.
>
> Berry has not yet made a determination as to whether or not it will exercise the AFEX Option. Such decision will be based upon prevailing conditions in the natural gas market prior to the expiration of the AFEX Option. In the event the Option is exercised, Berry has sufficient unused credit line capacity to fund the purchase price. Berry is also considering selling its rights under the AFEX Option, although no assurance can be given that a buyer will be found or that the price received by Berry would be equal to or greater than Berry's purchase price for the AFEX Option.

The Norris proxy/Berry prospectus went on to describe the expected activities of Norris after the merger as follows:

The reorganized Norris will continue the historic business activities of Norris, including the exploration, production, development and sale of oil and gas. Management anticipates that to fully develop the Norris reserves a substantial influx of capital into Norris will be required. Berry may contribute certain of its oil-producing properties to Norris to provide the operating cash flow and capital necessary to fully develop the Norris reserves. Many of the existing wells on the Norris properties must be abandoned or redrilled, and additional capital and qualified technical personnel will be required for the exploration and appraisal drilling needed to fully determine the development potential of the Norris properties.

Management believes that the rehabilitation of the Norris operations and properties will likely require outside financing. Although no arrangements or agreements that would provide such financing have as yet been made, various alternatives are being explored, including the use of venture partners to participate in the development of the Norris properties. Management has had preliminary discussions with several parties, including independent and major oil companies, to discuss the possibility of forming a joint venture for the exploration and development of Norris Rincon leases. Norris shareholders should recognize that no assurances can be given that management will be able to find a joint venture partner or other outside financing or to develop the Norris properties as intended. Declines in the price of crude oil could have a substantial adverse impact on Norris ability to obtain financing for its operations.

On June 26, 1987, the shareholders of Norris held a special meeting at which they approved the merger and exchange ratio. Of the 10,909,289 shares of Norris that were voted, 10,808,136 (10,147,616 of which were owned by petitioner) were voted in favor of the merger, 84,595 were voted against the merger, and 16,558 abstained. Not represented at the meeting were 1,686,595 Norris shares held by minority holders.

Effective June 26, 1987, Berry Acquisition Corp. was merged into Norris (Norris merger), and the surviving corporation immediately changed its name to Bush Oil Co. (Bush).

At a meeting on or about July 1, 1987, Exxon proposed a joint venture to develop Rincon, including a cash payment to Bush. Bush counter-proposed a swap involving the same property discussed during December 1986, or $10 million in cash plus unspecified future obligations. Exxon was not interested in swapping property interests, but it did make cash offers, none of which petitioner accepted.

In a letter to Bush dated August 7, 1987, the staff of the State Lands Commission stated that it would recommend a reduced royalty rate schedule to the State Land Commission.

In a letter dated August 14, 1987, Tenneco offered to buy a 50-percent working interest in Rincon for $12,150,000 and assumption of a disproportionate share of proposed development costs under which Tenneco would pay 75 percent of the first $48 million of development costs, amounting to $12 million of development costs that Bush would otherwise have been required to pay. Thereafter, following negotiations between Tenneco and Bush, and effective October 1, 1987, Bush sold a 50-percent working interest in Rincon to Tenneco for $28.5 million, consisting of $13 million in cash and Tenneco's assumption of a disproportionate share of initial development costs under which Tenneco agreed to pay 75 percent of the first $62 million of development costs, amounting to $15.5 million of development costs that Bush would otherwise have been required to pay.

During the time over which petitioner acquired Norris, petitioner did indeed require natural gas for its operations and was contracting for natural gas supplies from various suppliers in 1986 and early 1987.

ABEG did not believe that petitioner desired to purchase the Afex properties, but did believe that petitioner strongly desired to acquire ABEG's Norris stock. ABEG therefore made petitioner's entry into the Afex option a condition of selling its Norris stock to petitioner. At the time Mr. Dorobek asked petitioner to buy the option, petitioner had done no due diligence on the value of the Afex properties. This was because the Afex option did not enter the negotiations until ABEG conditioned the sale of its Norris stock on petitioner's purchase of the Afex option. By September 29, 1986, when the Afex option was negotiated and entered into, ABEG had only provided petitioner with the GEC reserve report, and petitioner had not done its due diligence on the Afex properties. Mr. Dorobek therefore did not consider $8,162,000 to be a firm price. Although negotiations regarding the Afex option had resulted in a lowering of the exercise price and an extension of the option period, the cash price of $1.2 million remained constant. After petitioner counter-proposed, in place of the original $10,715,215 asking price, the $8,162,000 total purchase price for the Afex properties, there were no further negotiations on price. Mr. Dorobek did not believe that petitioner would pay the agreed-upon exercise price of

$6,920,000, because it was too high and "nobody's going to pay off a reserve report."

The Afex option was unusual in that neither petitioner nor anyone else would have wanted to enter into it as proposed, but petitioner was forced to enter into it in order to be able to purchase ABEG's Norris stock. Gas prices were already substantially depressed by June 1986, but continued to decline slightly from June 1986 to December 1987.[5] The gas contracts on the Afex properties "all had out clauses", which allowed the gas purchaser to get out of the contract; these contracts reduced the desirability of the Afex properties, especially at the relatively low spot price of gas then current.

Petitioner conducted a careful due diligence investigation of Norris' Rincon leases, but only the most perfunctory investigation of the Afex properties. It was not until February 1987 that Raymond L. Hatch, petitioner's manager of engineering, sought the most basic information regarding the Afex option properties, and later that month that answers to some of his questions began to arrive. However, petitioner never attempted to renegotiate downward the $6,920,000 exercise price of the Afex option, as Mr. Dorobek expected and would have been amenable to.

In 1987 or 1988, after the Afex option had expired, Afex sold the Afex properties to another buyer, Harken Oil Co., for approximately $2 million.

---

[5] Bryant testified that gas prices during this period were declining. When Mr. Dorobek attempted to testify to the same effect, his testimony was stricken on respondent's objection, and the Court adverted to the possibility of taking judicial notice of the prices of natural gas during this period. Those prices are indeed available, and the Court takes judicial notice of them. Virtually all the decline that occurred in this period took place at its beginning, and it was trivial in comparison with a larger decline that had already occurred. Selected prices per thousand cubic feet of natural gas follow:

| Month | Price |
| --- | --- |
| Feb. 1985 | $2.71 |
| Feb. 1986 | 2.26 |
| June 1986 | 1.85 |
| July 1986 | 1.80 |
| Aug. 1986 | 1.77 |
| Oct. 1986 | 1.73 |
| Nov. 1986 | 1.77 |
| Dec. 1986 | 1.76 |
| Jan. 1987 | 1.74 |
| Nov. 1987 | 1.64 |
| Dec. 1987 | 1.70 |

Energy Information Administration/Historical Monthly Energy Review 1973–1992, at 297.

Petitioner's Federal consolidated corporation income tax return for 1987 reported a loss of $1.2 million on the lapse of the Afex option, an $8,102,283 gain from the sale of the interest in Rincon, and deduction of $6,561,927 for the Norris/Bush net operating loss carryovers.[6]

## 2. *Wiegand Litigation*

The sale of Rincon was publicly announced on September 29, 1987. On October 2, 1987, Jeff Wiegand, a former Norris shareholder, filed a class action lawsuit (Wiegand litigation) in the Court of Chancery of the State of Delaware against petitioner and the directors of Norris. The complaint alleged that Wiegand and the former minority public owners of Norris had been "irreparably damaged by the [Norris] Merger and sustained a substantial loss as a result thereof". In November 1987, petitioner filed an answer to the complaint.

On January 24, 1989, Wiegand filed an amended complaint, which read in part:

### AMENDED CLASS ACTION COMPLAINT

Plaintiff, by his attorneys, alleges upon information and belief, except as to paragraphs 2 and 3, which are alleged on knowledge:

### NATURE OF ACTION

1. This breach of fiduciary duty-merger fraud class action:

(a) *Has its origins in* the June 26, 1987 freezeout, exchange of stock merger, of the public minority shareholders of Norris Oil Corp., a Nevada corporation ("Norris"), by Norris' parent, defendant Berry Oil Corp., a private 156 shareholder Delaware corporation ("Berry"), which had purchased 80.6% of Norris' Stock, on December 1, 1986, from ABEG, an Australian Co., for 75¢ a share cash and cash equivalent (the "ABEG Purchase");

(b) *Is against* Berry, which grossly overvalued its own stock which it exchanged for Norris shares, at $15 per share, while grossly undervaluing the Norris Stock at only 50¢ per share.

(c) Is the result of the fraud on the Norris minority shareholders, perpetrated by defendant Berry—in the "Berry Prospectus" and continuously thereto from December 1, 1986 to the "Norris Merger," as hereafter defined—by misrepresenting and concealing the actual values of Norris, including valuing Norris' Rincon oil field at a mere $2.2 million when immediately after the merger, Berry sold a 50% Rincon interest to Tenneco

---

[6] Petitioner's marginal tax rate was approximately 46 percent, and the tax benefit provided by the net operating loss carryovers was more than $3 million.

Oil and Production Co. ("Tenneco") for $13.5 million plus $47.5 million for development costs (the "Rincon Deal").

\* \* \* \* \* \* \*

### CLASS ACTION ALLEGATIONS

5. This action is properly maintained as a class action, in that the Selling Class consists of more than 500 former owners of Norris minority shares; the Merger Fraud Class consists of more than 2,000 former owners of Norris minority shares; and both classes are so numerous that the joinder of all members of each Class is impracticable; Plaintiff is a member of each Class, was irreparably damaged, as herein alleged, and sustained a substantial loss as a result thereof. Plaintiff is committed to pursuing this action, has competent counsel experienced in litigation of this nature, and, accordingly, plaintiff will fairly and adequately represent and protect the interests of each Class and its respective members; there are questions of law and fact common to members of each Class, and plaintiff's claims are typical of the claims of the members of each Class; the prosecution of separate actions by individual members of each Class would create a risk of inconsistent and varying adjudications; a class action is superior to other available methods for the fair and efficient adjudication of the controversy; and Plaintiff's claims are typical of the members of each Class and plaintiff has suffered the same kind of injury and damage as the other members of each Class.

\* \* \* \* \* \* \*

[Pars. 6 through 14 alleged facts with respect to Berry's acquisition of Norris. Pars. 15 through 19 alleged that Berry had material information about, and took actions with respect to, Norris, which it failed to disclose to the Norris minority shareholders. Pars. 20 through 30 alleged that Berry had material information about, and plans with respect to, Rincon, which it failed to disclose to the Norris minority shareholders. Pars. 31 through 36 alleged facts with respect to Tenneco's acquisition of a 50-percent interest in Rincon. Pars. 37 through 44 alleged that, in SEC filings and shareholder communications made prior to the merger, Berry belittled the value of Rincon and failed to disclose material information about its value. Pars. 45 through 48 alleged that Berry had total control of the valuation process. Pars. 49 through 56 alleged that Wedbush Securities Inc. improperly evaluated the exchange ratio. Pars. 57 through 61 alleged that the Berry prospectus improperly disparaged Norris and "buried the better news" about Norris, and that it was materially misleading with respect to the ABEG purchase.]

### COUNT I

62. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 61, as if fully set forth herein.

63. This Count I arises under the common law of the State of Delaware.

64. As majority shareholder, with its management and directors operating Norris:

(a) Berry owed, jointly and severally, an uncompromising duty of loyalty to Norris and its minority shareholders, which was heightened by the fact that (i) Berry acted simultaneously for both Norris and Berry; (ii) Berry retained the same attorneys and accountants for both; and (iii) that there were no outside directors or Special Committee of independent directors to represent the Norris minority shareholders, and to evaluate the fairness of the Exchange Ratio.

(b) Berry was so intertwined, interwoven and integrated with Norris, that it acted by one indivisible hand and voice.

(c) Berry had at all times an acute and irreconcilable conflict of interest between its fiduciary duties to Norris and Berry, and similarly, between its self-interest, on the one hand, and its duty as majority shareholder, to Norris and its minority shareholders, on the other.

65. The facts and information alleged in Pars. 8 through 10, and 15 through 30 inclusive, were material to an informed evaluation, by the Norris minority shareholders, of their Norris investment (the "Informed Evaluation"), from time to time, and in connection with the Merger Prospectus.

66. Berry deliberately and wilfully, in blatant breach of its fiduciary obligations to the Norris minority, withheld material information, and discredited Norris—in order to deny the Norris minority and the public of the ability to make an Informed Evaluation.

67. Berry deliberately and wilfully withheld the Norris and Berry information and insight, which Berry had; failed to communicate that information and insight to the Norris minority, or to the public, and therefore it was not reflected in the Norris market price, or in the Norris Merger price.

68. By reason of the foregoing, the Norris minority, in being cashed out—or who sold before the merger—were deprived of most of the real investment value of their shares.

69. Since there was no independent negotiating structure for the Exchange Ratio and the Merger, Berry had an undiluted fiduciary obligation to both Norris and Berry, in the light of what is best for both, including a duty of complete candor.

70. Berry's acts and omissions, aided and abetted by Wedbush, with respect to the Fraudulent Exchange, as herein alleged, were wilful and deliberate, and a fraud on the Norris minority, by a self-interested fiduciary who thereby deliberately and wilfully breached its fiduciary obligations to the Norris minority.

71. Berry, by virtue of being on both sides, as herein alleged—aided and abetted by Wedbush—breached its duty of utmost good faith and most scrupulous inherent fairness to Norris, plaintiff and the Norris minority shareholders, in at least the following respects:

(a) Berry deliberately and wilfully grossly undervalued Rincon and concealed its extraordinarily high upside potential.

(b) Berry concocted an Exchange Ratio which had no relationship to the fair value of Norris and Berry.

(c) Berry deliberately and wilfully failed to disclose in The 13-D Fraud, the nature and extent of their future plans for the freeze-out of the Norris minority, as herein alleged.

(d) Berry deliberately and wilfully misrepresented the ABEG Purchase Price to be .375¢ per share, when in fact, it was equivalent to approximately 75¢ per share, so that the Fraudulent Exchange was a one-third discount, and not a premium over the ABEG Purchase Price.

(e) Berry deliberately and wilfully failed to promptly, and with complete candor, disclose its relations with Tenneco, as herein alleged, including a full and fair disclosure in the Berry Prospectus.

(f) Berry deliberately and wilfully failed to promptly and with complete candor, disclose to the Norris minority, its evaluations of Norris and Rincon, as it did to the Lowells[, who were significant shareholders of Berry].

(g) Berry deliberately and wilfully failed to promptly and with complete candor, from time to time, disclose its Rincon partnership presentations, and their estimate of $60 million for development costs and their explanation for such an expenditure on a property appraised at only $2.2 million.

(h) Berry deliberately and wilfully failed to disclose with complete candor, in its January 30, 1987 and April 7, 1987 Fraudulent Exchange announcements, and in the Berry Prospectus, that Bryant had set the Fraudulent Exchange and the fair market value guidelines.

(i) Berry deliberately and wilfully failed to disclose promptly, and with complete candor, as it arose, the §16(b) insider short swing profits claim that Norris had against ABEG; *that Berry had helped to conceal*; and why the Norris shareholders were not credited with their pro rata share of the §16(b) claim [emphasis in original].

(j) Berry deliberately and wilfully failed to disclose in the Berry Prospectus, (and on April 7, 1987, when Wedbush gave the Berry/Norris Boards a detailed explanation of the basis for its fairness opinion), that Bryant had padded the Berry assets by $10 million, as herein alleged.

72. Berry breached its duty of complete candor to Norris and its minority shareholders, by deliberately and wilfully failing, in the Berry Prospectus to make the disclosures of the material information alleged in Paragraphs 40, 60 and 61 hereof, and in failing to disclose, *inter alia:*

(a) The fair value of the Norris Shares.

(b) The fair value of the Berry Shares.

(c) An itemized breakdown of the Norris merger values to Berry, and the fair value of the pro rata share thereof, of the Norris' minority.

73. Berry breached its duty of fair dealing to Norris and its minority shareholders, by perpetrating the Proxy Fraud, as herein alleged.

74. By reason of the foregoing, the exchange ratio was grossly unfair, a fraud on Plaintiff and the Class, the Norris Merger is unenforceable, null and void, and Plaintiff and the members of The Merger Fraud Class are entitled to rescissory damages, and Plaintiff and the members of the Sellers Class are entitled to the difference between their net sales price and the fair value of their shares.

WHEREFORE, plaintiff demands judgment as follows:

(a) Declaring the Norris Merger and exchange ratio null and void.

(b) Ordering and directing defendant Berry to pay to the members of the Merger Fraud Class rescissory damages, including that number of additional Berry shares, as will equal the fair value of their Norris shares, namely, the benefit of the bargain they would have had if full disclosure had been made, including a valuation of Berry's future earnings, power valued prospectively from June 26, 1987, with interest, or, alternatively, the cash value thereof.

(c) Ordering and directing Berry to pay to each member of the Selling Class, in cash, the difference between their net selling price and the fair value of their shares, plus interest.

(d) Directing Berry to account to Plaintiff and the members of each class for all damages, losses, expenses, attorneys' fees and other payments sustained or incurred by virtue of the conduct and transactions complained of.

(e) Awarding Plaintiff and the members of each class the value of all Berry shares of which they have been unlawfully deprived, from the date of the merger to the date of judgment, with interest.

(f) Awarding Plaintiff his reasonable costs, disbursements, expert and other professional fees incurred in the prosecution of this action, including counsel fees.

(g) Granting such other and further relief as may be proper and equitable in the premises.

The amended complaint dropped the directors of Norris as defendants and named only petitioner as defendant.

Petitioner filed an answer, dated March 24, 1989, to Wiegand's amended complaint, asserting:

### FIRST SEPARATE AND ADDITIONAL DEFENSE

75. Plaintiff's Amended Complaint fails to comply with the provisions of Rule 23 of the Rules of the Court of Chancery and this action may not be maintained as a class action on behalf of either class alleged in the Amended Complaint.

### SECOND SEPARATE AND ADDITIONAL DEFENSE

76. The Amended Complaint fails to state a claim upon which relief can be granted because, *inter alia,* under Delaware law, statutory appraisal pursuant to 8 Del. C. §262 is the exclusive remedy for the wrong alleged in the Amended Complaint since any conduct by Berry was neither fraudulent nor improper.

### THIRD SEPARATE AND ADDITIONAL DEFENSE

77. Plaintiff voted all his shares of Norris in favor of the merger. Accordingly, plaintiff has acquiesced in the merger and is barred and estopped from asserting the claims alleged herein.

The Delaware Court of Chancery issued a memorandum opinion, *Wiegand v. Berry Petroleum Co.,* Civ. A. No. 9316

(Del. Ch., Dec. 5, 1989), and an order dated April 2, 1990, that certified Wiegand as the representative of the "selling class" and the "merger class". All Norris shareholders who sold Norris stock between December 15, 1986, and May 10, 1987, were qualified for the selling class. None of those shareholders had been entitled to vote or exchange their stock in the Norris merger. Shareholders who owned Norris stock prior to December 15, 1986, and continued to hold that stock until May 11, 1987, were qualified for the merger class. Those holders had been entitled to vote on the proposed Norris merger. The Delaware Court of Chancery found that there was no material conflict between the certified classes.

Petitioner filed a motion for summary judgment dated January 23, 1990, and Wiegand filed a cross-motion for partial summary judgment (on the issue of liability) dated April 30, 1990. In petitioner's motion for summary judgment, petitioner sought

a judgement of dismissal as a matter of law, because (i) it has established that Berry dealt fairly with the minority, (ii) the plaintiff has failed to adduce any competent evidence that the merger consideration was not fair, and (iii) the plaintiff, who voted in favor of the merger and accepted consideration after full disclosure of all material facts, acquiesced in the transaction and is therefore equitably barred from attacking it.

Petitioner's brief in support of its motion for summary judgment asserted that Wiegand's allegations that petitioner "bad-mouthed" Norris and concealed the true value of Rincon were

creative writing and skillful lawyering but it not only embroiders, but also conceals, the real thrust of plaintiff's case. This action was brought because of, and is founded upon, the fact that approximately three months after the merger in which the Rincon Field had been valued at 2.2 million dollars, Berry sold a 50% working interest in the field to Tenneco for 13 million dollars and a disproportionate share of the exploration and development costs. This fact, plaintiff claims, establishes that Berry undervalued Rincon. Everything else in the complaint is merely intended to clothe this fact in the garb of an evil, fraudulent act and to qualify plaintiff to bring a "quasi-appraisal" action even though he voted in favor of the merger.

* * * * * * *

Simply stated, plaintiff's case of "merger remorse" fails to state an actionable claim.

Petitioner's brief also stated that "In a parent-subsidiary merger transaction, the issues are those of fairness." The Delaware Court of Chancery issued a memorandum opinion, *Wiegand v. Berry Petroleum Co.,* Civ. A. No. 9316 (Del. Ch., Mar. 27, 1991), in which it applied Delaware corporate law [7] and denied both motions for summary judgment because material facts were in dispute.

Petitioner and Wiegand (individually and on behalf of the selling class and merger class) entered a stipulation of settlement, dated October 4, 1991, which the parties to the case at hand have included in the stipulations of fact as part of the record. The Delaware Court of Chancery, by order dated November 25, 1991, approved the stipulation of settlement, under which petitioner agreed to pay the former Norris minority shareholders $5 million.

In the stipulation of settlement, Wiegand and petitioner agreed that

all claims, rights or causes of action, whether known or unknown, that have been, could have been, or in the future might be asserted by plaintiff or the Classes he represents, in this Action or any other court of competent jurisdiction, including but not limited to those which arise out of or relate in any manner to the ownership, sale or conveyance of any Norris stock from December 15, 1986 onward or which relate in any manner to the actions and/or omissions of Berry after the [Norris] Merger * * * shall be and hereby are conclusively compromised, settled, released and dismissed with prejudice, upon and subject to the following terms and conditions:

* * * * * * *

2) Berry shall pay the sum of $5,000,000 in full satisfaction of all the claims asserted by the two Classes and for all counsels' fees and expenses awarded by the Court * * *. The entire $5,000,000 payment is made with respect to the claims concerning the omission and misrepresentation of material facts by Berry prior to the [Norris] merger that purportedly damaged the Selling Class and the actions of Berry management occurring after the [Norris] Merger, including the fraudulent and improper exercise of fiduciary duties. Berry denied and continues to deny vigorously that the Norris stock was undervalued in any amount or at all in the [Norris] Merger, and no portion of the $5,000,000 payment is related to any such claim. * * *

---

[7] The memorandum opinion of the Delaware Court of Chancery stated that "Because Norris was a Nevada corporation, Delaware law would not, strictly speaking, apply in determining the propriety of Berry's conduct as Norris' majority shareholder. However, because both parties rely on Delaware law in support of their positions, the Court has applied Delaware law on the basis that all parties concede its application." *Wiegand v. Berry Petroleum Co.,* Civ. A. No. 9316, slip op. at 14 n.9 (Del. Ch., Mar. 27, 1991).

The parties also agreed that "No differentiation will be made in determining the amount of the Settlement to be paid to a Class member between members of the Selling Class and the members of the Merger * * * Class."

During 1987, 1988, and 1989, petitioner incurred various costs, including legal fees, directly related to the Wiegand litigation of $21,160, $110,825, and $493,651, respectively. For those years, petitioner deducted the respective amounts as ordinary and necessary business expenses.

### 3. *Ultimate Findings of Fact*

(1) The properties subject to the Afex option (the exercise price of which was $6,962,000) were worth approximately $3 million on December 1, 1986, and the Afex option itself (for which petitioner paid $1.2 million) was then worth less than $12,000, or less than 1 percent of the fair market price of the Afex properties at the time the Afex option was entered into.

(2) Neither petitioner nor the ABEG/Afex interests ever had any expectation or intention that petitioner would exercise the Afex option.

(3) ABEG originated (and required as a condition of its sale of Norris stock to petitioner) the Afex option as a means of avoiding ABEG's potential liability under section 16(b).

(4) The purchase of the Afex option lacked economic substance, and the ostensible $1.2 million purchase price of the Afex option was additional consideration paid by petitioner for the purchase of ABEG's Norris stock.

(5) Although tax avoidance was not petitioner's primary purpose in agreeing to the Afex option transaction, the option served a tax avoidance purpose of petitioner by giving it a reporting position to claim a $1.2 million loss on the expiration of the option, which petitioner never intended or expected to exercise.

(6) ABEG and petitioner disguised the $1.2 million payment as being for the Afex option; in so doing, ABEG took the position on its section 16(b) reports that it had not realized a recoverable profit under section 16(b), and petitioner was aided in its effort to put as low as possible a value on the stock of Norris for the purpose of setting the exchange ratio in the Norris merger.

(7) The Wiegand litigation had its origins in petitioner's acquisition of the stock of Norris.

## B. OPINION

### 1. *Afex Option*

#### a. *Respondent's Motion To Strike Mr. Hoffman's Testimony*

At the first day of trial, April 28, 1993, after petitioner's attorney had designated Mr. Hoffman as petitioner's representative, we ordered the exclusion of witnesses under Rule 145. After petitioner's attorney indicated that Mr. Bryant would be petitioner's lead-off witness, we allowed Mr. Bryant to testify first, but said that Mr. Hoffman should not be present in the courtroom before Mr. Hoffman testified. We ordered Mr. Hoffman and Mr. Bryant not to discuss their testimony with each other until they had both testified. We also allowed another of petitioner's witnesses, Mr. Dorobek, to testify before Mr. Hoffman, and, at our insistence, Mr. Hoffman remained outside the courtroom during Mr. Dorobek's testimony.

Mr. Hoffman did not testify as a witness until the second day of trial, April 29, 1993. It became apparent, during respondent's cross-examination of Mr. Hoffman, that petitioner's counsel Mr. Brennan had discussed Mr. Dorobek's testimony with Mr. Hoffman. Respondent then moved that Mr. Hoffman's testimony with respect to the Afex option issue be stricken from the record as a sanction for violation of our Rule 145(a) exclusion order.

On July 1, 1993, we denied respondent's motion to strike testimony of Mr. Hoffman. We concluded that, while we could have properly insisted that Mr. Hoffman, petitioner's designated representative, testify first, *United States v. Parodi*, 703 F.2d 768, 774 (4th Cir. 1983), we were not authorized to order him to be absent from any part of the trial. Rule 145(a)(2), like rule 615(2) of the Federal Rules of Evidence, on which it is based, clearly denies the trial judge the authority to exclude "an officer or employee of a party which is not a natural person designated as its representative by its attorney". Although there are authorities permitting a party to have more than one representative, and respondent asserted that petitioner's counsel intended Mr. Bryant to be a second representative,[8] the record of the trial makes clear

---

[8] It is arguable, and respondent asserts, that petitioner's counsel intended Mr. Bryant to be

that petitioner's counsel intended Mr. Hoffman to be petitioner's representative. The cases of Rule 145 violations cited by respondent, *Smith v. Commissioner*, 92 T.C. 1349 (1989), and *Colorado Natl. Bankshares, Inc. v. Commissioner*, 92 T.C. 246 (1989), are distinguishable because they involved third-party witnesses, not party representatives, and the same is true of *Thompson v. Commissioner*, 92 T.C. 486 (1989). We therefore did not need to consider the validity of petitioner's interposition of the attorney-client privilege to respondent's efforts to require disclosure of the communications between Mr. Hoffman and petitioner's counsel.

In any event, the result we reach on the Afex option issue would be the same even if we were to strike Mr. Hoffman's testimony. There has been no showing of prejudice to respondent, which would be required if we were to impose so harsh a penalty as striking testimony. *United States v. Hobbs*, 31 F.3d 918, 922 (9th Cir. 1994) (plain error for trial court to administer the "strongly disfavored" sanction of precluding defense witnesses from testifying because exclusion order was violated); *Colorado Natl. Bankshares, Inc. v. Commissioner, supra* at 249 (requiring showing of prejudice

---

a second representative. Case law is divided on whether a party can have more than one representative. Compare *Hampton v. Kroger Co.*, 618 F.2d 498, 499 (8th Cir. 1980) (allowing multiple representation, apparently on basis of Fed. R. Evid. 615 as a whole); *United States v. Alvarado*, 647 F.2d 537, 540 (5th Cir. 1981) (allowing presence of more than one Government agent, citing, in addition to Fed. R. Evid. 615(2), Fed. R. Evid. 615(3), which allows presence of person "essential" to case); *United States v. Payan*, 992 F.2d 1387, 1393–1394 (5th Cir. 1993); and *Breneman v. Kennecott Corp.*, 799 F.2d 470, 473–474 (9th Cir. 1986) (both withholding judgment on whether trial court's allowance of multiple representation was error and finding error to be harmless) with *United States v. Rivera*, 971 F.2d 876, 889 (2d Cir. 1992) (apparently holding that permitting presence of second agent would have been error if opposing party had complained); *United States v. Pulley*, 922 F.2d 1283, 1285–1286 (6th Cir. 1991) (holding trial court's allowance of multiple representation to be harmless error); *United States v. Farnham*, 791 F.2d 331, 334 (4th Cir. 1986) (holding trial court's allowance of multiple representation to be presumptively reversible error: other party need not even show prejudice); and *United States v. Kosko*, 870 F.2d 162, 164 (4th Cir. 1989) (ostensibly reaffirming *Farnham*, but limiting it by allowing presence of second agent under Fed. R. Evid. 615(3)). Petitioner's counsel arguably requested that Mr. Bryant be allowed to be present at the trial not under exception (2) of Rule 145(a) (and Fed. R. Evid. 615) for representatives, but rather under exception (3), for "a person whose presence is shown by a party to be essential to the presentation of such party's cause." However, even if we were to hold both that petitioner intended Mr. Bryant to be a second representative and that Rule 145(a) does not allow multiple representation, petitioner and petitioner's counsel were not so clearly bound by any resulting obligation as to warrant the imposition of any sanctions. In the area of discovery abuse, an order must be valid for any violation of it to be sanctionable, *Holcomb v. Allis-Chalmers Corp.*, 774 F.2d 398, 400–401 (10th Cir. 1985), and a flouted order must be specific and unambiguous, not implied, *R.W. Intl. Corp. v. Welch Foods, Inc.*, 937 F.2d 11, 17–19 (1st Cir. 1991); *Salahuddin v. Harris*, 782 F.2d 1127, 1131–1132 (2d Cir. 1986). We see no reason why the same doctrines should not apply to alleged violation of a witness exclusion order.

before sanctions can be imposed under Rule 145); see also *United States v. Lee,* 800 F.2d 903, 904 (9th Cir. 1986); *United States v. Gibson,* 675 F.2d 825, 836 (6th Cir. 1982) (showing of prejudice required before sanctions can be imposed for violation of Fed. R. Evid. 615).

b. *Disallowance of Loss Claimed on Expiration of Afex Option and Allocation of Ostensible Price of Afex Option to Petitioner's Cost of Norris Stock*

i. *Lack of Economic Substance of Afex Option Under Valuation Analysis*

The first substantive issue arising from petitioner's acquisition of Norris stock is whether petitioner is entitled to a loss deduction of $1.2 million for 1987 because of its failure to exercise the Afex option. Taxpayers are entitled to loss deductions for their bases in options as of the date that the options expire unexercised. Sec. 1234(a)(1); *Old Harbor Native Corp. v. Commissioner,* 104 T.C. 191, 200 (1995); *Willis v. Commissioner,* T.C. Memo. 1983–180, revd. on other grounds 736 F.2d 134 (4th Cir. 1984). Respondent disallowed the loss deduction claimed by petitioner on the ground that the $1.2 million ostensibly paid by petitioner for the Afex option was part of its purchase price for ABEG's stock in Norris. Respondent argues that the substance-over-form doctrine dictates denial of the loss deduction because the $1.2 million must be treated as part of petitioner's cost basis in the Norris stock that it purchased from ABEG.

Valuation of the properties subject to the Afex option and of the option itself is critical for resolution of this issue. Valuation is a question of fact, and the trier of fact must weigh all relevant evidence to draw the appropriate inferences. *Commissioner v. Scottish American Inv. Co.,* 323 U.S. 119, 123–125 (1944); *Helvering v. National Grocery Co.,* 304 U.S. 282, 294 (1938); *Tripp v. Commissioner,* 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963–244; *Skripak v. Commissioner,* 84 T.C. 285, 320 (1985); *Estate of Trenchard v. Commissioner,* T.C. Memo. 1995–121.

Both parties have presented expert testimony in support of their positions on the valuation questions raised by the Afex option issue. We weigh expert testimony in light of the expert's qualifications as well as all other credible evidence

in the record. *Estate of Newhouse v. Commissioner,* 94 T.C. 193, 217 (1990). We are not bound by the opinion of any expert witness, and we will accept or reject that expert's testimony when, in our best judgment, based on the record, it is appropriate to do so. *Id.; Chiu v. Commissioner,* 84 T.C. 722, 734 (1985). While we may choose to accept the opinion of an expert in its entirety, *Buffalo Tool & Die Manufacturing Co. v. Commissioner,* 74 T.C. 441, 452 (1980), we may also be selective in the use of any portion of an expert's opinion, *Parker v. Commissioner,* 86 T.C. 547, 562 (1986).

We have found that, on December 1, 1986, the Afex properties (the option exercise price of which was $6,962,000) were worth approximately $3 million, and that the Afex option itself (for which petitioner ostensibly paid $1.2 million) was worth no more than $12,000. These conclusions are based on our evaluation of the testimony of both parties' experts and on our application of valuation techniques that petitioner has suggested, and are confirmed by the price paid for the optioned properties on the later sale of the properties to Harken.

On March 26, 1993, the independent oil and gas consulting firm of H.J. Gruy & Co. rendered an opinion for respondent on the fair market value of the Afex properties, as of December 1, 1986, and on the reasonableness of the option price. Robert J. Naas, H.J. Gruy's registered professional engineer and respondent's expert witness at trial, concluded that the fair market value of the Afex properties, as of December 1, 1986, was $2,965,000 and that a 1-year option to purchase them at a fair exercise price would be worth 15 percent of that value, or $450,000.

Petitioner's expert James R. Weddle reviewed the GEC reserve report, and opined that the total option price of $8,162,000 and the price for the option of $1.2 million were reasonable, based upon the value of the properties as derived from the GEC reserve report and other reports available to petitioner in 1986. In 1987 or 1988, after the Afex option had expired, Afex sold the optioned properties to a third party, Harken Oil Co., for approximately $2 million.[9] That last

---

[9] We have seen, see *supra* note 5, that there was no substantial drop in the price of natural gas between November/December 1986, when the option agreement was executed, and November/December 1987, when the option expired. Rather, it was on the order of only 5 percent, as compared with the much more substantial drop in gas prices during the 18-month period prior

price, with no substantial intervening drop in the price of natural gas, confirms that Mr. Naas' valuation of the optioned properties was not too low.

Petitioner argues that the value of an option depends not only on the fair market value of the optioned property and the exercise price, but also on the length of the option period and the price volatility of the optioned property, and refers to some standard textbook discussions of option valuation. Petitioner further argues that Mr. Naas took no account of period length and volatility. Although Mr. Naas, who is apparently an expert in oil and gas rather than in finance, appears to have made some intuitive judgments on values, he did take the length of the option period into account. In his view, the value of an option with a fair exercise price that remains outstanding for 3 or 4 months would be 10 percent of the fair market value of the underlying property, whereas the value of an option with a period of 1 year would be 15 percent of the fair market value. Petitioner's expert Mr. Weddle reached essentially the same conclusion, as in his opinion "it was quite reasonable to pay 14.7% as an option price, which would be fully creditable against the purchase price and thus equivalent to a down payment, in order to hold the property for one year." Mr. Naas may not have been conscious of taking volatility into account, but his judgment based on experience does not depart from reality. Consulting one of the textbooks to which petitioner's counsel refers us, we find a table summarizing the application of the Black-Scholes option-valuation model, which indicates that the Afex option as it was actually structured was worth less than $12,000,[10] or less than 1 percent of the price ostensibly paid for it.

to the time that ABEG broached the subject of the option in September 1986. Testimony at trial was unclear about whether the ultimate sale to Harken took place in 1987 or 1988. However, the low price of this actual sale cannot be explained by a further decline in prices in 1988, as prices in that year were higher than in 1987. The price of a thousand cubic feet of natural gas at wellhead was $1.96 in January 1988 and $1.89 in December 1988 (compared to $1.70 in December 1987). Energy Information Administration/Historical Monthly Energy Review 1973–1992 at 298.

[10] The table is appendix table 6, Brealey & Myers, Principles of Corporate Finance AP12-AP13 (4th ed. 1991). Accepting Mr. Naas' valuation of the Afex properties at approximately $3 million, an option with a period of 1 year and with an exercise price equal to the fair market value of the optioned property will be worth 15 percent of that fair market value if the volatility of the price is represented by a standard deviation of .40 (of the fair market value). If that is the case, then the Afex option with an exercise price 2.33 times as great as the optioned property's fair

Although the Afex option was ostensibly priced by petitioner, as buyer, and ABEG, as seller, at approximately 15 percent of the option exercise price for the Afex properties, the Afex option was nevertheless egregiously overpriced. This is because the option exercise price for the purchase of the Afex properties was correspondingly overstated at more than twice their fair market value at the time the option was entered into. As a result, the parties did not intend or expect that the Afex option would be exercised, as we have found.

In order to apply the Black-Scholes option pricing model, which petitioners have suggested that we use, we have used the following data: The term of the option (1 year); its exercise price ($6,962,000); the fair market value of the subject properties (approximately $3 million); and the volatility of the value of those properties (standard deviation of .40 of value resulting from both experts' valuation of a fairly priced 1-year option at 15 percent of value of underlying properties). Applying the Black-Scholes model to these data, we find that the value of the option is insignificant compared to the price petitioner ostensibly paid ($10,500 compared to $1.2 million).

### ii. *Substance v. Form*

Respondent argues that the substance-over-form doctrine requires us to treat the payment ostensibly made for the Afex option (the form) as additional consideration for ABEG's Norris stock (the substance). Respondent cites covenant-not-to-compete cases, including *Schulz v. Commissioner*, 294 F.2d 52, 56 (9th Cir. 1961), affg. 34 T.C. 235 (1960), and *Annabelle Candy Co. v. Commissioner*, 314 F.2d 1 (9th Cir. 1962), affg. T.C. Memo. 1961–170. Petitioner argues that the substance was the same as the form and that petitioner honestly paid the $1.2 million for the Afex option. We agree with respondent.

---

market value will be worth .35 percent (extrapolated from the table) of the fair market value of the optioned property, or about $10,500.

The standard deviation, .40, appears to substantially overstate the price volatility factor. If we input the wellhead prices for natural gas for 1985 and 1986 given by Energy Information Administration/Historical Monthly Energy Review 1973–1992, at 297, see *supra* note 5, we find that the mean price was $2.215 per thousand cubic feet, and the standard deviation was $.339, or .153 times the mean price, which would result, if applied to the facts of this case, in an even smaller value for the option.

The Black-Scholes model, which first appeared in Black & Scholes, "The Pricing of Options and Corporate Liabilities", 81 J. Pol. Econ. 637 (1973), is discussed in Brealey & Myers, *supra* at 482–510.

In the case at hand, when the facts are viewed in the light of the substance-over-form doctrine, the agreement to purchase the Afex option is economically insubstantial. There was only pro forma negotiation concerning the option. See *Payne v. Commissioner,* 22 T.C. 526, 531 (1954); *Full Service Beverage Co. v. Commissioner,* T.C. Memo. 1995–126. Due diligence on petitioner's part was perfunctory. Petitioner paid a total of $5 million for both the Norris stock and the Afex option, whereas petitioner initially offered to pay $5 million for the stock alone. The option did not begin to be discussed until late in the negotiations; the purchase price of the option was grossly inflated; and petitioner made no effort to renegotiate the option exercise price, as the ABEG/Afex interests expected it would. In these circumstances, even though ABEG and petitioner expressly agreed to the option, neither of them had any real intention or expectation that the option would be exercised. *Fidler v. Commissioner,* T.C. Memo. 1980–346.

Even more like the Afex option issue than the covenant-not-compete cases, and decided in favor of respondent and respondent's argument, is *Particelli v. Commissioner,* 212 F.2d 498 (9th Cir. 1954), affg. a Memorandum Opinion of this Court dated Feb. 20, 1952. There, in order to avoid having profits from the sale of wine confiscated under the OPA price-control regime in effect during World War II, the vintner taxpayer sold the buyer both the wine inventory the buyer wanted and the winery the buyer did not want, and seller and buyer allocated the aggregate purchase price so as to minimize the profit from the wine. The Court of Appeals for the Ninth Circuit cited *Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945), for the proposition that the parties' allocation of the aggregate purchase price was unreal, and could and should be changed to reflect economic reality for the purpose of determining the seller's tax liability. *Particelli v. Commissioner, supra* at 500. A "mere subterfuge or sham" would not be allowed to permit the avoidance of taxes. *Id.* In *Particelli,* the interests of the parties as to how much of the total purchase price to allocate to the winery were not adverse because any high profits realized by the buyer "would be offset by high depreciation deductions based on the over-valuation of the winery or by any loss sustained from the resale of the winery." *Id.* at 501 n.6; see also *Black Industries, Inc. v. Commissioner,* T.C. Memo. 1979–61.

Similarly, in the case at hand, both ABEG and petitioner had congruent interests to minimize the price ostensibly paid by petitioner for ABEG's shares of Norris stock—ABEG to avoid section 16(b) liability and petitioner to help reduce what it would be required to pay for the minority holders' shares of Norris stock in the planned merger, as well as to produce a loss deductible for income tax purposes on expiration of the option.

The result in *Particelli* rested in part on the lack of arm's-length negotiations about the allocation of the overall agreed price. The Court of Appeals for the Ninth Circuit upheld this Court's *finding of fact* that the real agreement between the contracting parties was not the written agreement with its separately stated prices. The Court of Appeals also laid stress, as had this Court in its findings, on the disparity between the stated price of $273,000 for the winery and the price of $20,000 for which the winery was sold a year later. *Id.* at 501. The similarities to the case at hand are obvious, and the result should be the same.

*Frank Lyon Co. v. United States,* 435 U.S. 561, 583–584 (1978), and *United States v. Consumer Life Ins. Co.,* 430 U.S. 725, 739 (1977), do not preclude the result we reach here, since they both required that the transactions whose form they said should be respected should have economic substance. The jurisprudence both of this Court and of the Court of Appeals for the Ninth Circuit reflects the view that the fact that a transaction has a business purpose—and petitioner arguably had a business purpose in closing the Norris stock deal and attempting to make it possible for ABEG to avoid the application of section 16(b)[11]—does not require the conclusion that the option transaction has economic substance. *Casebeer v. Commissioner,* 909 F.2d 1360, 1363 (9th Cir. 1990), affg. T.C. Memo. 1987–628, affg. *Moore v. Commissioner,* T.C. Memo. 1987–626, affg. *Sturm v. Commissioner,* T.C. Memo. 1987–625, affg. in part and revg. and remanding in part *Larsen v. Commissioner,* 89 T.C. 1229

---

[11] Cf. *Bershad v. McDonough,* 428 F.2d 693, 697 (7th Cir. 1970): "The commercial substance of the transaction rather than its form must be considered, and courts should guard against sham transactions by which an insider disguises the effective transfer of stock." In appropriate cases, prices have been reallocated from the form adopted by the parties in order to reflect economic reality, resulting in recoverable profits under sec. 16(b). See *Mayer v. Chesapeake Ins. Co.,* 698 F. Supp. 52, 56–57 (S.D. N.Y. 1988), affd. 877 F.2d 1154 (2d Cir. 1989); *Reece Corp. v. Walco Natl. Corp.,* 565 F. Supp. 158, 166 (S.D.N.Y. 1981).

(1987); *Sochin v. Commissioner,* 843 F.2d 351, 354 (9th Cir. 1988), affg. *Brown v. Commissioner,* 85 T.C. 968 (1985); *Zmuda v. Commissioner,* 731 F.2d 1417, 1420–1421 (9th Cir. 1984), affg. 79 T.C. 714 (1982); *Cherin v. Commissioner,* 89 T.C. 986, 992–994 (1987); *James v. Commissioner,* 87 T.C. 905, 924 n.5 (1986), affd. 899 F.2d 905 (10th Cir. 1990); *Carlson v. Commissioner,* T.C. Memo. 1987–306. In the case at hand, the disparity between the price agreed upon for the Afex option and its fair market value was so great and the likelihood that it would become economically rational to exercise the option was so small that the option transaction as structured truly lacked economic substance. Consequently, we uphold respondent's determination denying petitioner the loss deduction on the expiration of the Afex option.

## 2. *Disallowance of Current Deduction for Wiegand Litigation Costs*

Petitioner deducted, as ordinary and necessary business expenses under section 162(a), legal expenses and other costs attributable to its defense of Wiegand's class action lawsuit. Petitioner asserts that those expenses are deductible because the suit had its origin in "the alleged breach of fiduciary duty committed by Petitioner with respect to its disclosures of material information regarding the Rincon Lease and its effect on the value of the Norris Minority Stock" and not in the process of acquisition. Respondent has determined that the costs attributable to the Wiegand litigation should be capitalized under section 263. Respondent asserts that the lawsuit had its origin in "the Norris/Berry merger" and that the legal expenses "provided significant long term benefits to Berry which had an indefinite life".

We agree with petitioner that a necessary element of the plaintiff's case in the Wiegand litigation was the alleged breach of fiduciary duty committed by petitioner. However, allegations of breach of fiduciary duty alone do not suffice to establish that the expenses to defend the lawsuit are deductible. See *Larchfield Corp. v. United States,* 373 F.2d 159, 165–166 (2d Cir 1966) (relying on Judge Frank's "powerful dissent" in *Hochschild v. Commissioner,* 161 F.2d 817, 819–820 (2d Cir. 1947), revg. 7 T.C. 81 (1946), and refusing to conclude that *Hochschild* stands for the proposition that a

director's litigation costs for defense of a claim of breach of fiduciary duty are always deductible[12]). The Norris directors were dropped from the Wiegand litigation, leaving petitioner, who was the only original defendant to have acquired any of the Norris minority stock, as the sole defendant. It was petitioner's position as Norris' majority shareholder and acquiror of the Norris minority stock that created its fiduciary duty, which was a necessary element of Wiegand's lawsuit. The material facts of, and the law controlling, the Wiegand litigation had their origins in the acquisition of Norris stock by petitioner.

Long before *INDOPCO, Inc. v. Commissioner,* 503 U.S. 79 (1992), it was "recognized, as a general matter, that costs incurred in the acquisition or disposition of a capital asset are to be treated as capital expenditures" and are to be "added to the basis of the capital asset with respect to which they are incurred". *Woodward v. Commissioner,* 397 U.S. 572, 574–575 (1970). Ancillary expenses incurred in acquiring or protecting an interest in an asset are as much a part of the cost of the asset as the purchase price. *Id.* at 576; *Arthur H. DuGrenier, Inc. v. Commissioner,* 58 T.C. 931, 938 (1972) (applying origin-of-the-claim test to find a settlement payment to be additional part of purchase price).

"[T]he characterization * * * of the litigation costs of resisting a claim depends on whether or not the claim *arises in connection with* the taxpayer's profit-seeking activities" as opposed to its consequences. *United States v. Gilmore,* 372 U.S. 39, 48 (1963) (costs ostensibly incurred to protect a taxpayer's income-producing property had their origin in his wife's claim for divorce). "[A]n expenditure that would ordinarily be a deductible expense must nevertheless be capitalized if it is incurred in connection with the acquisition of a capital asset." *Ellis Banking Corp. v. Commissioner,* 688 F.2d 1376, 1379 (11th Cir. 1982), affg. in part and remanding in part T.C. Memo. 1981–123. Whether litigation expenses are incurred in the acquisition of a capital asset depends not on the "primary purpose" test used in cases of defense of title to property, but instead "involves the simpler inquiry whether the origin of the claim litigated is in the process of

---

[12] Judge Frank's dissent in *Hochschild v. Commissioner,* 161 F.2d 817, 820 (2d Cir. 1947), revg. 7 T.C. 81 (1946), was also cited with approval in Justice Marshall's majority opinion in *Woodward v. Commissioner,* 397 U.S. 572, 576 n.4 (1970).

acquisition itself." *Woodward v. Commissioner, supra* at 577; accord *Arthur H. DuGrenier, Inc. v. Commissioner, supra* at 938.

Petitioner points out, as it did in the Wiegand litigation, that Wiegand's claims did not assert dissenters' appraisal rights.[13] Petitioner therefore argues that the litigation costs of that suit are distinguishable from those in *Woodward* and *United States v. Hilton Hotels Corp.,* 397 U.S. 580 (1970), because the costs in those cases arose from claims asserted under shareholder dissent and appraisal procedures. Petitioner's distinction is not determinative. Although the establishment of an initial purchase price may be more clearly a part of the process of acquisition than the issues in the Wiegand litigation, our task in the case at hand is "to determine whether the origin of [this] particular litigation lies in the process of acquisition". *Woodward v. Commissioner, supra* at 578. We find that the Wiegand litigation had its origins in petitioner's acquisition of Norris stock that culminated in the Norris merger.

Wiegand's original class action complaint stated that Wiegand and the former minority public owners of Norris were "irreparably damaged by the [Norris] Merger and sustained a substantial loss as a result thereof". Wiegand's amended class action complaint stated that the breach of fiduciary duty *"Has its origins in* the June 26, 1987 freezeout, exchange of stock merger, of the public minority shareholders of Norris". After discovery, Wiegand sought "partial summary judgement on the issue of liability, contending that as a matter of law Berry cannot carry its burden of showing that the [Norris] merger was entirely fair". *Wiegand v. Berry Petroleum Co.,* Civ. A. No. 9316, slip op. at 12 (Del. Ch., Mar. 27, 1991).

Petitioner's answer to the amended class action complaint asserted that statutory appraisal of the (Norris) merger was the plaintiff's exclusive remedy. Petitioner sought

---

[13] When denying Wiegand's and Berry's cross-motions for summary judgment, the Delaware Chancery Court noted that the validity of Wiegand's vote for the merger (and hence Berry's defense of acquiescence) turned on the adequacy and accuracy of the disclosures in the Berry prospectus. The Delaware Chancery Court was unwilling to find, as a matter of law, that the Berry prospectus disclosed to the Norris minority shareholders all material facts, and concluded that an evidentiary hearing was necessary to resolve the parties' conflicting contentions. *Wiegand v. Berry Petroleum Co.,* Civ. A. No. 9316, slip op. at 19–24 (Del. Ch., Mar. 27, 1991).

a judgment of dismissal as a matter of law, because (i) it has established that Berry dealt fairly with the minority, (ii) the plaintiff has failed to adduce any competent evidence that the [Norris] merger consideration was not fair, and (iii) the plaintiff, who voted in favor of the [Norris] merger and accepted consideration after full disclosure of all material facts, acquiesced in the transaction and is therefore equitably barred from attacking it. [*Wiegand v. Berry Petroleum Co.,* Civ. A. No. 9316, slip op. at 13 (Del. Ch., Mar. 27, 1991).]

Petitioner's brief in support of its motion for dismissal characterized the Wiegand litigation as a "'quasi-appraisal' action".

The factual allegations and legal arguments of Wiegand and petitioner focused on the Norris merger and the establishment of a fair exchange price and ratio.

Petitioner asserts that "even if the Norris Merger had never occurred, * * * there almost certainly would have been a Wiegand type lawsuit brought by a 'selling class' * * *. In short, the Wiegand Litigation was not predicated upon Petitioner's status as a buyer of the plaintiff's stock in the Norris Merger". However, we are not faced with the deductibility of expenses without a merger, and petitioner's position on both sides of the Norris merger was the fundamental reason why the Delaware Court of Chancery scrutinized petitioner's conduct under the exacting standard of the "entire fairness rule". See *Kahn v. Lynch Communication Sys., Inc.,* 638 A.2d 1110, 1116 (Del. 1994) ("It is often of critical importance whether * * * the business judgment rule applies or the entire fairness rule applies." (quoting *Nixon v. Blackwell,* 626 A.2d 1366, 1376 (Del. 1993))); *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1279 (Del. 1989) (determination of whether the business judgment rule or the entire fairness rule applies is frequently determinative of the outcome of the suit).

Under normal circumstances, a Delaware court will not interfere with the managerial decisions of a board of directors by substituting its judgment for the business judgment of the directors. *Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34, 42 (Del. 1994) (citing *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984)); Henn & Alexander, Law of Corporations 661 (3d ed. 1983). The business judgment rule creates a powerful presumption "'that if actions are arguably taken for the benefit of the corporation, then

the directors are presumed to have been exercising their sound business judgment'". *Panter v. Marshall Field & Co.,* 646 F.2d 271, 294 (7th Cir. 1981) (quoting *Johnson v. Trueblood,* 629 F.2d 287, 292 (3d Cir. 1980)); *Rales v. Blasband,* 634 A.2d 927, 933 (Del. 1993). However, "When directors * * * are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." *Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del. 1983).

Because petitioner, as the majority shareholder of Norris, stood on both sides of the Norris merger, and fixed the terms of the merger, it had to satisfy the "entire fairness standard of review * * *. That exacting standard requires the defendant fiduciary to prove, after careful scrutiny by the Court, that the challenged transaction was entirely fair to the minority stockholders." *Wiegand v. Berry Petroleum Co.,* Civ. A. No. 9316, slip op. at 14 (Del. Ch., Mar. 27, 1991) (citing *Weinberger v. UOP, Inc., supra* at 710). Petitioner's acquisition of the Norris stock gave rise to such scrutiny and therefore to the Wiegand litigation.

Petitioner attempts to distinguish the claims of the selling class from the claims of the merger class by asserting that

*there is no acquisitive conduct by Petitioner which is directly related to the claims made by the Selling Class. The acquisitive conduct was between the Selling Class and third parties in open-market transactions. The Selling Class was not involved in the Norris Merger and did not claim that it incurred damages as a result of the Norris Merger. Accordingly, the origin of the Selling Class claims could not possibly be the Norris Merger.*

With apologies to Shakespeare, Hamlet, III, ii, 240, petitioner protests not only too much but with too much emphasis, and we disagree.

Although the selling class' measure of damages might have been different from that of the merger class, the claims of both classes had a common origin in petitioner's acquisition of the Norris stock. The Delaware Court of Chancery found that there was no material conflict between the classes, and it made no distinctions between the classes when it decided Wiegand's and petitioner's cross-motions for summary judgment and approved the parties' stipulation of settlement. Nor did Wiegand and petitioner draw any distinctions between

the classes in their briefs in support of their motions for summary judgment or in their stipulation of settlement.

In *United States v. Hilton Hotels Corp.,* 397 U.S. 580, 584 (1970), the Supreme Court noted that the fact that title to the appraised stock had passed was "a distinction without a difference. The functional nature of the appraisal remedy as a forced purchase of the dissenter's stock is the same, whether title passes before or after the price is determined." Although petitioner had acquired title to the Norris minority stock and paid the price established by the exchange ratio, petitioner's alleged misrepresentations and omissions with respect to the establishment of the exchange ratio (and hence with respect to the price that petitioner paid for the Norris minority stock) were the primary subjects of the Wiegand litigation.

Because the Wiegand litigation had its origins in the process of acquisition culminating in the Norris merger, the costs attributable thereto are not deductible as ordinary and necessary business expenses, but must be capitalized as acquisition costs of the Norris stock.

III. ISSUE 3: EFFECTS OF SECTION 382 ON USEFULNESS OF NET OPERATING LOSS CARRYOVERS

A. FINDINGS OF FACT

1. *General Findings of Fact*

At all relevant times, petitioner and its subsidiaries were engaged in the exploration, development, production, and sale of oil and natural gas, including "heavy oil". "Heavy oil" has such high viscosity and low specific gravity that it will not flow at normal temperatures. Various capital-intensive "enhancement" techniques are required to extract heavy oil from the ground and to transport it to the refinery.

During the years 1981 through 1988, Tosco Corp. (Tosco) was engaged primarily in the business of refining petroleum. During 1981, Tosco organized Tosco Enhanced Oil Recovery Corp. (Teorco) to acquire and operate heavy-oil properties. By 1987, Teorco had become a relatively low-cost producer of heavy oil, but it was still only marginally profitable and would have required capital contributions from Tosco of at least $2 million per year over the next 3 years. Although the

market for oil-producing properties was weak in 1987, Tosco decided to get out of its heavy-oil business, which then consisted primarily of Teorco's leasehold interests in four heavy-oil properties in the San Joaquin Valley of California (Placerita, McKittrick, Edison Grove, and Jasmin). Of these interests, only Placerita had generated significant gross receipts, and Tosco viewed McKittrick, Edison Grove, and Jasmin as liabilities.

Tenneco Oil Co. (Tenneco), a substantial operator of heavy-oil projects, owned most of the leasehold interests surrounding Placerita. Prior to November 1987, Tenneco offered to purchase Placerita from Teorco for $7.5 million. Tosco rejected this offer because it did not wish to sell Teorco's properties separately. Tosco did not wish to retain responsibility for any large, undiscovered contingent liabilities, nor did it wish to sell Teorco's "crown jewel"—Placerita—and get stuck with the "dogs". Tosco offered to sell Tenneco the Teorco stock, but Tenneco only wanted Placerita. Negotiations between Tosco and Tenneco ended prior to November 1987.

After surveying other heavy-oil producers to determine whether they were interested in purchasing Teorco, Tosco formulated a marketing plan to sell Teorco. In addition to making many telephone calls to potential buyers, Tosco circulated a letter dated November 20, 1987, announcing that Teorco's business operations did not fit into Tosco's long-term business plan and that Tosco was prepared to sell Teorco for an acceptable price. The letter stated:

Tosco will be most interested in cash at close of sale and any deferred or contingent future payments will be heavily discounted. It is Tosco's intention to expose this opportunity widely and to accept offers by mid-February [1988]. Tosco reserves the right to reject any and all offers or it may enter into negotiations with any interested party with the objective of closing a sale by the end of April 1988.

Copies of this letter were sent to petitioner and approximately 20 other companies that Tosco thought might be interested in purchasing Teorco.

By a letter dated December 11, 1987, Tosco announced the procedure for submitting bids for the Teorco stock. The letter stated:

To be considered at this time by TOSCO, offers to purchase TEORCO must be received in writing at the above Santa Monica address by February 18, 1988. TOSCO reserves the right to reject any and all offers for any reason. * * * TOSCO is particularly interested in "all cash at closing" payment terms and may heavily discount any deferred or contingent future payments.

Other offer submission procedures are as follows:

1) All offers should specify price, payment terms, anticipated closing and should be directed to [T.L. Stringer] in writing at the above address. If the offer is subject to further due diligence or verification of certain assumptions, these conditions should be specific and limited.

2) We prefer that any offers delivered to TOSCO prior to February 18, 1988 be sealed, addressed to Tosco Corp., attention General Manager of Oil, Gas & Minerals, with clear indication on the outside of the sealed offer that it is an OFFER FOR TEORCO.

3) Offers for specific properties or assets, if considered at all, will be considered secondary to any offer to purchase 100% of the stock of TEORCO. It is Tosco's intent to sell the entire company.

4) TOSCO may require financial statements and bank references prior to considering a specific offer.

5) Within seven (7) business days of written notice from TOSCO of apparent acceptability of the offer, offeror should be prepared to make an earnest money deposit of at least 5% of the offered price.

Tosco sent copies of this letter to petitioner and other parties that might have been interested in purchasing Teorco.

Even before petitioner received Tosco's November 20 letter, petitioner and Tenneco had informally discussed their mutual interests in Teorco. After petitioner received Tosco's December 11 letter, petitioner and Tenneco engaged in formal discussions. As a result, petitioner and Tenneco entered a letter agreement dated January 13, 1988, in which they agreed to act jointly in the bidding for Teorco. Pursuant to that letter agreement, petitioner and Tenneco entered an agreement dated February 18, 1988 (the acquisition agreement), in which petitioner agreed to sell Placerita to Tenneco if petitioner should be the successful bidder for Teorco. Although the agreement was between Tenneco and petitioner, it specifically identified Bush as a wholly owned subsidiary of petitioner, and described Bush's role in the acquisition.

The acquisition agreement provided that petitioner, through Bush, would submit a timely offer of $6.5 million for 100 percent of the stock of Teorco, would submit only offers that had been reviewed by Tenneco, would inform Tenneco of any communications or negotiations with Tosco, and, if Bush

were the successful bidder, would cause Teorco to assign Placerita to Tenneco immediately after the closing of petitioner's acquisition of Teorco. As consideration for Teorco's assignment of Placerita, Tenneco agreed to pay $1,250,000 more than the final adjusted purchase price for all the Teorco stock, but not more than $7,750,000, and to assume all financial, environmental, and contractual obligations related to Placerita. The acquisition agreement was subject to Tenneco's right to review the terms and provisions of the stock purchase agreement between petitioner and Tosco.

By letter dated February 18, 1988 (the Bush offer), Bush offered to purchase 100 percent of the stock of Teorco for $6.5 million in cash, payable at closing. The Bush offer was subject to certain preclosing conditions, including assignment of certain leases and agreements, termination of the Placerita operating agreement, payment or assumption of certain obligations, and removal of liens relating to Placerita. The Bush offer indicated that the transaction was expected to close on April 1, 1988.

Throughout the process of acquiring Teorco, petitioner's board discussed the advantages of acquiring the stock of Teorco under the assumption that Bush would acquire the assets of Teorco. When Bush made its offer to purchase the Teorco stock from Tosco, petitioner and Bush intended to merge Teorco and Bush within a year of acquisition.

Tosco received only one other bid, which it did not consider responsive. If Tosco had not been able to sell Teorco, Tosco had plans and access to the capital necessary to continue Teorco's business operations. These plans included investing $7 million to $9 million at Placerita and $5 million at Jasmin during the next 2 to 3 years.

Tosco considered $6.5 million to be an adequate price, and by letter dated February 26, 1988, Tosco accepted the Bush offer, subject to minor modifications and amendments. Bush and Tosco executed a stock purchase agreement, stated to be effective at midnight April 30, 1988 (the stock agreement). The closing was scheduled for May 6, 1988.

Bush and Tenneco then executed an agreement, stated to be effective at 7 a.m., May 1, 1988, for the sale of Placerita to Tenneco (Placerita agreement). The closing was scheduled for May 6, 1988.

Articles 3.02(a) and 3.02(b)(1) through (7) of the Placerita agreement list the warranties and representations that Bush was to obtain from Tosco. The language of these articles is substantially identical to the language of Articles 3.7 and 3.8(a) through (g) of the stock agreement. Tenneco agreed in the Placerita agreement that Articles 3.7 and 3.8(a) through (g) of the stock agreement satisfied the requirements of Articles 3.02(a) and 3.02(b)(1) through (7) of the Placerita agreement. Bush also agreed to use its best efforts to cause Tosco and Teorco to provide Tenneco with all material information regarding Placerita.

In the Placerita agreement, Tenneco agreed to indemnify Bush and Teorco for "all claims, costs, expenses and liabilities with respect to * * * [Placerita], whether such claims, costs, expenses and liabilities accrue or relate to times prior to or after" the sale, except claims, costs, expenses and liabilities attributable to negotiation of the Placerita sale, gross negligence or willful misconduct, and certain litigation and claims for which Tosco assumed liability and indemnified Teorco.

Bush and Tosco closed the Teorco stock purchase pursuant to the stock agreement.[14] Immediately upon closing, Bush caused Teorco to change its name to C.J. Co.[15] C.J. Co. and Tenneco then closed the Placerita sale pursuant to the Placerita agreement. Neither Tosco nor Teorco was a party to the Placerita agreement or any other agreement for the sale of Placerita to Tenneco.

At the time of Teorco's ownership change, its principal business was the acquisition, development, and holding of heavy-oil properties in California, and the production and sale of heavy oil from those properties.

Immediately prior to the stock closing on April 30, 1988, the gross values of Teorco's assets were as follows:

| | |
|---|---|
| Placerita .................................................................... | $7,750,000 |
| McKittrick (50-percent interest) ........................................ | 2,000,000 |
| Jasmin ...................................................................... | 250,000 |

[14] Although the parties have stipulated that Berry purchased the Teorco stock, it is clear from the record that Bush, acting on behalf of Berry, purchased the Teorco stock, and we so find. See *Jasionowski v. Commissioner*, 66 T.C. 312, 318 (1976).

[15] The names "Teorco" and "C.J. Co." thus refer to the same corporate entity. Hereinafter we will use "Teorco" to refer to the corporation before the ownership change, and "C.J. Co." to refer to the corporation after the ownership change.

| | |
|---|---|
| Jasmin equipment ............................................................ | 385,000 |
| Edison Grove (35-percent interest) .................................. | 200,000 |
| Jasmin note receivable[1] .................................................. | 1,588,155 |
| Accounts receivable ....................................................... | 289,278 |
| Inventory ....................................................................... | 165,787 |
| Prepaid expenses ........................................................... | 12,274 |
| Total gross asset value ................................................. | 12,640,494 |

[1] Teorco had received this note when it had sold property located near Jasmin to an unrelated third party. The remaining 15 quarterly payments (including interest at 12 percent) were secured by an irrevocable letter of credit from Union Bank of Switzerland.

Known liabilities totaled $535,569, and after the transfer of stock, C.J. Co. reserved an additional $200,000 for unknown contingencies.

Tosco represented that its officers had no actual knowledge of liabilities, other than those disclosed in its financial statements, but Tosco made no representation or warranty with respect to liabilities imposed under "Proposition 65".[16] Petitioner's due diligence efforts did not disclose any liabilities that its management thought it could not handle. Petitioner believed that Tenneco was excessively concerned about possible environmental liabilities associated with McKittrick, Edison Grove, and Jasmin.

Immediately after Bush purchased Teorco, C.J. Co. had net operating loss carryovers of $8,109,272 and investment tax credit carryovers of $336,169, both arising in preacquisition years. In calculating the amount of C.J. Co.'s 1988 and 1989 taxable income that could be offset by those net operating loss carryovers, petitioner used $6.5 million as the value of Teorco. Petitioner's Federal consolidated income tax returns showed a $262,882 net operating loss deduction for 1988 and a $485,550 net operating loss deduction for 1989.[17]

[16] Proposition 65, the Safe Drinking Water and Toxic Enforcement Act of 1986, was added to California's Health & Safety Code by Initiative Measure, approved by a referendum on Nov. 4, 1986. Cal. Health & Safety Code Ch. 6.6. (West 1992). Proposition 65 prohibits persons from knowingly discharging toxic chemicals into any source of drinking water or from knowingly or intentionally exposing an individual to any chemical known to cause cancer without first giving clear warning. Cal. Health & Safety Code secs. 25249.5, 25249.6 (West 1992). It provides a civil penalty (in addition to any other penalties established by law) of up to $2,500 per day per violation. Cal. Health & Safety Code sec. 25249.7(b) (West 1992). The Act allowed actions to be brought by any person without a showing of damages. Cal. Health & Safety Code sec. 25249.7(d) (West 1992).

[17] The amount of net operating loss deducted in 1988 was equal to the amount of the alternative minimum tax net operating loss deduction for that year. Berry did not attempt to use any of the investment credit carryovers in either 1988 or 1989.

Pursuant to section 1.382–2T(a)(2)(ii) and (h)(4)(vi)(B), Temporary Income Tax Regs., 52 Fed. Reg. 29675–29676, 29685 (Aug. 11, 1987), petitioner attached a disclosure statement to its 1988 income tax return, electing to treat April 30, 1988, as the date of the ownership change. Bush did not file a section 338 election under section 1.338–1T, Temporary Income Tax Regs., 49 Fed. Reg. 35088 (Sept. 6, 1984), to treat the purchase of Teorco stock as a purchase of Teorco's assets.

For Federal income tax purposes, the basis of Placerita in the hands of C.J. Co. was unaffected by the ownership change, and petitioner's 1988 Federal consolidated income tax return showed a $79,068 gain from the sale of Placerita to Tenneco. For financial reporting purposes, Bush treated its acquisition of the stock of C.J. Co. as an acquisition of assets and used a residual approach to allocate the cost of the stock to C.J. Co.'s assets.[18] Petitioner's financial statements for the year ended December 31, 1988, showed a $1,969,160 gain from the sale of Placerita to Tenneco.

On December 1, 1988, C.J. Co. advanced Bush $1 million, and, on March 6, 1989, C.J. Co. advanced Bush $2,625,946. Both advances were evidenced by demand notes bearing interest at the Wells Fargo Bank's prime rate, plus 1 percent. Bush made monthly interest payments on these notes through May 22, 1989.

On March 23, 1988, a court had ruled that Bush was in default on its $2,675,577 note payable to ABEG, which petitioner had guaranteed as part of its purchase of 80 percent of the stock of Norris (now Bush) from ABEG. In March 1989, Bush paid its note to ABEG (less a $50,000 discount) using the proceeds of the March 6 advance from C.J. Co.

Early in 1988, petitioner had realized that, if the major oil companies refused to buy or transport the heavy oil it was producing, it would not be able to transport its heavy oil out of the San Joaquin Valley. Although C.J. Co. did not currently need a blending facility,[19] C.J. Co. expected that it would eventually need to blend and transport oil from

---

[18] For financial statement purposes, Bush allocated the cost of the Teorco stock dollar-for-dollar to the book value of accounts receivable, inventory, and the Jasmin receivable, and allocated the remaining cost to Placerita. No cost was allocated to McKittrick, Jasmin, Edison Grove, or any equipment.

[19] Blending lighter oil and heavy oil reduces the heavy oil's viscosity so that it will flow through a pipeline at normal temperatures.

McKittrick, and petitioner believed that it needed a blending facility to secure reliable transportation of oil from its other properties. In an attempt to solve these problems, petitioner negotiated with Enron to purchase a one-half interest in a blending facility in the San Joaquin Valley. Negotiations seemed to go well, and, as of May 19, 1989, C.J. Co. planned to purchase a one-half interest in the Enron blending facility on July 1, 1989.

Negotiations for purchase of an interest in the Enron blending facility were ultimately unsuccessful, and the planned purchase did not occur. However, in May 1989, in anticipation of that purchase, Bush distributed a dividend to petitioner by transferring all its stock in C.J. Co. to petitioner. C.J. Co. thereupon changed its name to Berry Oil Trading & Transportation Co. (for simplicity, we continue to refer to the acquired corporation as C.J. Co.). The shift of C.J. Co. to first-tier subsidiary of petitioner was intended to facilitate intercompany sales between petitioner and C.J. Co. after the purchase of the blending facility, and to allow C.J. Co. to pay dividends directly to petitioner if C.J. Co. should become more profitable. Immediately prior to Bush's distribution to petitioner, Bush caused C.J. Co. formally to distribute a $3,625,946 dividend to Bush by canceling the prior advances to Bush in that amount. The record contains no stated explanation of the reason for the dividend from C.J. Co. to Bush.

After the failure of petitioner's efforts to have C.J. Co. purchase an interest in a blending facility, petitioner decided to design and build a blending facility. On November 14, 1989, C.J. Co. and Shoreline Energy Corp. entered a joint venture to build and operate a blending facility in the San Joaquin Valley, which opened in May 1990.

Soon after Bush had purchased Teorco, C.J. Co. moved a steam generator, tanks, a water treatment facility, and insulated tubing from Jasmin to one of petitioner's properties. Petitioner did not pay C.J. Co. for the use of that equipment, and eventually C.J. Co. transferred ownership of the equipment to petitioner without consideration.

Soon after Bush had purchased Teorco, C.J. Co. also purchased its coowner's 65-percent interest in Edison Grove, and thereafter upgraded the property and continued to produce oil from the property. On September 1, 1989, C.J. Co. sold

Edison Grove, except "deep rights", to an unrelated party for $200,000.[20] On September 6, 1989, C.J. Co. sold Jasmin, except one lease, to an unrelated party for $250,000. Between May 1, 1987, and September 6, 1988, C.J. Co. paid $123,693 for capital acquisitions, improvements, and selling expenses relating to Edison Grove and Jasmin.

When Bush acquired Teorco, Chevron USA, Inc. (Chevron), was the operator of McKittrick and was producing only enough oil therefrom to hold the lease. C.J. Co. wanted Chevron to develop McKittrick fully, but Chevron refused to do so. Because C.J. Co. was unhappy with the way Chevron was operating McKittrick, C.J. Co. offered to sell its interest in McKittrick to Chevron, or to buy Chevron's interest. As a result, in October 1991, C.J. Co. purchased Chevron's 50-percent interest in McKittrick for an amount not disclosed in the record. After C.J. Co. acquired Chevron's interest in McKittrick, C.J. Co. spent approximately $4 million drilling new wells, reworking existing wells, and installing new fixtures and equipment.

On December 31, 1988 and 1989, C.J. Co. held the remaining proceeds of the sale of Placerita in short-term commercial notes and short-term Government securities, which totaled $7,035,636 and $5,732,269, respectively. The reduction between December 1988 and 1989 is attributable primarily to C.J. Co.'s $2,625,946 advance to Bush, which was used by Bush to pay its note to ABEG. On December 31, 1987, 1988, and 1989, Bush's cash balances were $10,709,990, $2,782,234, and ($32,939), respectively. The reduction between December 1987 and 1988 is attributable primarily to Bush's payment of $6.5 million to purchase the Teorco stock. On December 31, 1987, 1988, and 1989, petitioner's consolidated cash and cash equivalents totaled $26,989,000, $25,618,000, and $49,505,000, respectively.

Petitioner never abandoned its intent to merge Teorco out of existence as a separate entity. At the end of 1991, C.J. Co. was merged into petitioner.

---

[20] The parties have stipulated that, on Apr. 30, 1988, the value of Teorco's 35-percent interest in Edison Grove, before acquisition of the coowner's 65-percent interest and before improvements to the property, was $200,000. Although we doubt that the "deep rights" were as valuable as otherwise might be inferred from the above facts, the stipulated value of Teorco's 35-percent interest in Edison Grove is not clearly contrary to other facts in the record. See *Jasionowski v. Commissioner,* 66 T.C. at 318.

## 2. *Ultimate Findings of Fact*

(1) C.J. Co. continued the business enterprise of Teorco at all times during the 2 years after Bush acquired the stock of Teorco from Tosco.

(2) Immediately before Bush acquired the stock of Teorco from Tosco, the fair market value of the stock of Teorco was $6.5 million.

(3) The Jasmin note receivable was the only nonbusiness asset that Teorco held immediately before Bush acquired its stock, and its value was $1,588,155.

(4) Immediately after Bush acquired the stock of C.J. Co., C.J. Co. held $9,338,155 of nonbusiness assets, consisting of the Jasmin note receivable and Placerita.

### B. OPINION

## 1. *Background*

A major premise of petitioner's theory of the case is that section 382, as currently in effect, embodies the "neutrality principle": that the value of net operating loss carryovers should neither be increased or decreased as a result of changes in corporate ownership. From that premise, petitioner draws the corollary that exceptions to the neutrality principle should apply "only to factual circumstances which clearly fall within their intendment." Petitioner contends that, because respondent felt that the purchase of Teorco and the sale of Placerita provided petitioner with economic benefits that were "too good to be true", respondent recharacterized and reshuffled the facts and applied the exceptions expansively in order to deny petitioner the benefit of Teorco's net operating loss carryovers.

The original premise of respondent's case was that petitioner acquired Teorco "for the purpose of dismantling it, selling off its assets, and then utilizing its loss attributes." Respondent now relies more heavily on Congress' intent, as indicated by the legislative history, to restrict not only "trafficking" in loss corporations, but also "the appearance of trafficking". See S. Rept. 99–313, at 233 (1986), 1986–3 C.B. (Vol. 3) 1, 233; H. Rept. 99–426, at 258–259 (1985), 1986–3 C.B. (Vol. 2) 1, 258–259.

Petitioner made two great deals, arranging to have Bush purchase Teorco and sell Placerita on terms that enabled petitioner's management to "smile in clear anticipation that 'It was about to snow in their hats.'" *Doyle v. Commissioner,* 147 F.2d 769, 772 (4th Cir. 1945), affg. 3 T.C. 1092 (1944). Those deals continued to play out favorably as C.J. Co. developed its three other properties, sold the two minor properties (Jasmin and Edison Grove), and then integrated the remaining, fully developed property (McKittrick) into petitioner's preexisting heavy-oil business.

Our task is to decide how section 382 affects petitioner's ability to use Teorco's net operating loss carryovers on its consolidated returns.[21] What we have to work with is the most recent version of a complex, in parts ambiguous, statute, its legislative history, and the public comments, discussion, and debate that preceded its enactment, but no interpretative regulations. Cf. sec. 1.382–2T, Temporary Income Tax Regs., 52 Fed. Reg. 29675 (Aug. 11, 1987) (interpreting the ownership change provisions).[22]

## 2. *Section 382—Net Operating Loss Carryovers Generally*

Section 382 in its present form is the most recent statutory expression of a longstanding congressional perception that trafficking in loss carryovers must be regulated to prevent abuse. Section 382 of the 1954 Code subjected net operating loss carryovers to reduction or elimination under separate rules, whose application depended on whether the transfer of ownership was a purchase or a reorganization.[23] In 1976, section 382 was amended in an effort to coordinate the treatment of purchases and reorganizations and to close perceived loopholes in the types of transactions that would trigger the limitations.[24] Congress postponed the effective date of the

---

[21] Restrictions placed on the deduction of net operating loss carryovers by the SRLY rules of the consolidated return regulations under sec. 1502 have not been raised as an issue in this case. H. Conf. Rept. 99–841, at II–194 (1986), 1986–3 C.B. (Vol. 4) 1, 194; see Stewart & Call, "Overlap of NOL Limitation Provisions Causes Unwarranted Complexity", 21 J. Corp. Taxn. 353 (1995). Compare sec. 1.1502–21, Income Tax Regs. with secs. 1.1502–90 through 1.1502–99, Proposed Income Tax Regs., 56 Fed. Reg. 4194–4228 (Feb. 4, 1991).

[22] Respondent does not appear to have any open regulation projects under sec. 382 that would address any of the issues to be resolved in this opinion. See Tax Analysts, The Tax Directory, chart 5400, at 298 (Winter 1994/95).

[23] H. Conf. Rept. 99–841, at II–170 (1986), 1986–3 C.B. (Vol. 4) 1, 170. Compare sec. 382(a), I.R.C. 1954 with sec. 382(b), I.R.C. 1954.

[24] The Tax Reform Act of 1976, Pub. L. 94–455, sec. 806(e), 90 Stat. 1599, coordinated treatment of stock purchases and reorganizations, expanding the scope of both. It reduced net operat-

1976 amendments four times[25] before repealing them retroactively; they never became operative, and were replaced with the amendments to section 382 in effect during the years in issue.[26]

Section 382(a), as amended by the Tax Reform Act of 1986, Pub. L. 99–514, sec. 621(a), (e)(1), (f)(2), 100 Stat. 2254, 2266–2267, provides that, after certain significant changes in corporate ownership, the amount of income of a "new loss corporation"[27] that may be offset by loss carryovers arising prior to the ownership change shall not exceed the "section 382 limitation". The section 382 limitation is equal to the "value of the old loss corporation" multiplied by the long-term tax exempt rate (plus certain gains and any excess section 382 limitation from the prior year). Sec. 382(b).

The section 382 limitation does not directly limit the amount of the loss carryovers of an old loss corporation. It limits only their continuing usefulness. See S. Rept. 99–313, *supra* at 232, 1986–3 C.B. (Vol. 3) at 232; H. Rept. 99–426, *supra* at 257, 1986–3 C.B. (Vol. 2) at 257. The section 382 limitation is intended to approximate the annual income that the business capital of the old loss corporation would have generated, and thereby prevent the new loss corporation from using the loss carryovers faster than the old loss corporation could have used them in the absence of a change in ownership. Bittker & Eustice, Federal Income Taxation of

---

ing loss carryovers in proportion to the change in ownership, and it expanded the period in which ownership was tested to 3 years. See Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, at 191–193 (J. Comm. Print 1976); Staff of Joint Comm. on Taxation, Special Limitations on the Use of Net Operating Loss Carryovers and Other Tax Attributes of Corporations 9–10 (J. Comm. Print 1985).

[25] Revenue Act of 1978, Pub. L. 95–600, sec. 368(a), 92 Stat. 2857; Act of Dec. 29, 1979, Pub. L. 96–167, sec. 9(e), 93 Stat. 1279; Black Lung Benefits Revenue Act of 1981, Pub. L. 97–119, sec. 111, 95 Stat. 1640; Deficit Reduction Act of 1984, Pub. L. 98–369, sec. 62(a), 95 Stat. 583.

[26] Tax Reform Act of 1986 (TRA 1986), Pub. L. 99–514, sec. 621(a), (e)(1), (f)(2), 100 Stat. 2254, 2266–2267. Congress had several suggestions and proposals to draw from when drafting sec. 382. See, e.g., S. Prt. 99–47 (1985); American Bar Association Section of Taxation Committee on Corporate Relationships, "Legislative Recommendation 1985–1" (1985); American Law Institute, Federal Income Tax Project: Subchapter C, Proposals of the American Law Institute on Corporate Acquisitions and Dispositions and Reporter's Study on Corporate Distributions 198–301 (1982).

[27] The term "loss corporation" means a corporation that is entitled to use a net operating loss carryover for the taxable year in which an ownership change occurs. Sec. 382(k)(1). The term "old loss corporation" means a loss corporation before the ownership change, sec. 382(k)(2), and the term "new loss corporation" means a loss corporation after the ownership change, sec. 382(k)(3). The same corporation may be the old loss corporation and the new loss corporation. Sec. 382(k)(3). In this case, Teorco and C.J. Co. are the same corporation; Teorco is the old loss corporation, and C.J. Co. is the new loss corporation.

Corporations and Shareholders, par. 14.44[1][b], at 14–82 (6th ed. 1994).

Although the basic mechanical approach as described above arguably embodies the "neutrality" principle, Congress was concerned that the mechanical rules of section 382(b) would provide opportunities to structure transactions that would literally satisfy those rules but be inconsistent with their spirit and intent. S. Rept. 99–313, *supra* at 233, 1986–3 C.B. (Vol. 3) at 233; H. Rept. 99–426, *supra* at 258–259, 1986–3 C.B. (Vol. 2) at 258–259. To address those concerns, section 382 includes a series of somewhat overlapping responses, which impose obstacles to a new loss corporation's use of the old loss corporation's net operating loss carryovers in various situations. See, e.g., sec. 382(c), (e), (l)(1), (4). The operations of three of those statutory responses are at issue in this case.

Petitioner calculated the section 382 limitation using a value for Teorco of $6.5 million (Bush's purchase price), resulting in net operating loss deductions of $262,882 and $485,550 for 1988 and 1989, respectively. In the statutory notice of deficiency, respondent disallowed both deductions in their entirety on the ground that petitioner had not substantiated the loss. Petitioner alleged in its petition that it had erroneously calculated the section 382 limitation and that it should have calculated the limitation using a value of $16,723,645. In respondent's trial memorandum, the issue was narrowed to whether sections 269 and 382(c), (e)(2), and (l)(4) prevent petitioner's affiliated group from deducting, in whole or in part, the net operating loss carryovers of Teorco.[28] Respondent has conceded that section 269 does not apply.

The parties agree that Bush's acquisition of Teorco was an ownership change under section 382(g) and that the applicable long-term tax-exempt rate under section 382(f) is 7.47 percent. The parties disagree whether C.J. Co. continued the business enterprise of Teorco during the 2 years after the ownership change. If we should find that C.J. Co.

---

[28] By motion filed and amended on Apr. 21, 1993, petitioner asserted that respondent's trial memorandum raised new matters, and moved to shift the burden of proof to respondent on the disallowance of net operating loss carryovers under secs. 269 and 382(c), (e)(2), and (l)(4). By order dated Apr. 22, 1993, we denied petitioner's motion. On brief, petitioner has asked that we reconsider our order with respect to sec. 382(c) and (e)(2). We have done so, and reaffirm our order.

did not continue Teorco's business enterprise, the section 382 limitation would be zero under section 382(c). If we find that C.J. Co. did continue Teorco's business enterprise, we must decide what was the value of Teorco immediately prior to the ownership change and whether that value should be reduced under section 382(e)(2) by reason of the canceled advances from C.J. Co. to Bush and under section 382(l)(4) on the ground that C.J. Co. had enough nonbusiness assets to invoke that provision.

We hold that C.J. Co. continued Teorco's business enterprise at all times during the 2 years after the ownership change, that the fair market value of Teorco was $6.5 million immediately prior to the ownership change, and that value should be reduced by $3,625,946 (the canceled advances to Bush) under section 382(e)(2) and $1,520,866 (the Jasmin receivable less its share of Teorco's indebtedness) under section 382(l)(4).

### 3. *Continuity of Business Enterprise—Section 382(c)(1)*

Section 382(c)(1)[29] provides that if a new loss corporation does not continue the business enterprise of the old loss corporation at all times during the 2 years following an ownership change, the section 382 limitation is equal to zero (except for certain recognized gains). This is similar to the continuity-of-business requirement that a transaction must satisfy in order to qualify as a tax-free reorganization under section 368. H. Conf. Rept. 99–841, at II–189 (1986), 1986–3 C.B. (Vol. 4) 1, 189; S. Rept. 99–313, *supra* at 234, 1986–3 C.B. (Vol. 3) at 234; H. Rept. 99–426, *supra* at 260, 1986–3 C.B. (Vol. 2) at 260; see sec. 1.368–1(d), Income Tax Regs.[30]

---

[29] SEC. 382(c). CARRYFORWARDS DISALLOWED IF CONTINUITY OF BUSINESS REQUIREMENTS NOT MET.—

(1) IN GENERAL.—Except as provided in paragraph (2), if the new loss corporation does not continue the business enterprise of the old loss corporation at all times during the 2-year period beginning on the change date, the section 382 limitation for any post-change year shall be zero.

(2) EXCEPTION FOR CERTAIN GAINS.—The section 382 limitation for any post-change year shall not be less than the sum of—

(A) any increase in such limitation under—

(i) subsection (h)(1)(A) for recognized built-in gains for such year, and

(ii) subsection (h)(1)(C) for gain recognized by reason of an election under section 338, plus

(B) any increase in such limitation under subsection (b)(2) for amounts described in subparagraph (A) which are carried forward to such year.

[30] Although petitioner questions whether sec. 1.368-1(d), Income Tax Regs., is a valid interpre-

The fact that an acquired corporation and the acquiring corporation are in the same line of business tends to establish continuity, but is not determinative. Sec. 1.368–1(d)(3), Income Tax Regs. The new loss corporation must retain a link to the business enterprise of the old loss corporation, either by continuing the old loss corporation's historic business or by using a significant portion of the old loss corporation's historic business assets in a business. Sec. 1.368–1(d)(2), Income Tax Regs. This continuity-of-business requirement is broader, more objective, and more lenient than the corresponding requirement under section 382(a)(1)(C) of the 1954 Code, which required the acquired corporation "to continue to conduct a trade or business 'substantially the same' as its historic business." Ginsburg & Levin, Mergers, Acquisitions, and Buyouts, sec. 1208.3.1, at 1131 (Jan. 1995); 27 Tax Mgmt. (BNA), Net Operating Losses—Sections 381, 382, and 269, III, F, 5, at A–37 (5th ed. Oct. 19, 1992). Thus, a new loss corporation may discontinue more than a minor portion of the old loss corporation's historic business, or dispose of more than a minor portion of the old loss corporation's historic assets, and still satisfy the continuity-of-business requirement. H. Conf. Rept. 99–841, *supra* at II–189, 1986–3 C.B. (Vol. 4) at 189; sec. 1.368–1(d)(3) and (4), Income Tax Regs.

At all relevant times, petitioner was engaged in the exploration, development, production, and sale of domestic heavy oil. Teorco had acquired and operated heavy-oil properties while it was owned by Tosco. Throughout the 2-year period after the ownership change, C.J. Co. continued to acquire and hold heavy-oil properties. Although C.J. Co. sold Placerita, the most valuable property owned by Teorco, C.J. Co. continued to hold, and tried to develop, McKittrick, its second most valuable property, and it acquired its coowner's interest in Edison Grove, which it developed and operated and then sold.[31]

Respondent contends we should conclude that petitioner intended to dispose of all the assets of Teorco, particularly in

tation of sec. 368 and therefore of sec. 382, the legislative history clearly indicates that we look to that regulation to decide whether the continuity-of-business requirement of sec. 382(c) has been satisfied. See H. Conf. Rept. 99–841, at II–189 (1986), 1986–3 C.B. (Vol. 4) 1, 189.

[31] It also bears pointing out that, following the 2-year period, C.J. Co. acquired its coowner's interest in McKittrick and then developed and operated that lease.

view of C.J. Co.'s contingent offer to sell its interest in McKittrick to Chevron. However, neither the statute, the regulations, nor the legislative history provides persuasive support for respondent's contention; we consider only what actually happened during the 2 years following the ownership change, not what might have happened. Cf. *J.E. Seagram Corp. v. Commissioner*, 104 T.C. 75, 95 (1995).

Although the sale of Placerita substantially reduced what had been Teorco's historic business enterprise, C.J. Co. continued that business enterprise at all times during the 2-year period after the ownership change. Therefore, section 382(c)(1) does not reduce the section 382 limitation to zero, and the section 382 limitation must be calculated under section 382(a).

### 4. *Fair Market Value of Teorco*

The calculation of the section 382 limitation starts with "the value of the old loss corporation", sec. 382(a)(1), which in turn depends on the fair market value of the stock of the old loss corporation immediately prior to the ownership change, sec. 382(e), (k)(5). The fair market value of that stock is the price at which it "would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973) (a test "nearly as old as the federal income, estate, and gift taxes themselves"); *Morris v. Commissioner*, 70 T.C. 959, 988 (1978).

"[T]he best evidence of that value is, in general, actual sales made in reasonable amounts and at arm's length within a reasonable time before or after the date for which a value is sought." *Morris v. Commissioner, supra* at 988; *Narver v. Commissioner*, 75 T.C. 53, 96–97 (1980), affd. 670 F.2d 855 (9th Cir. 1982); H. Conf. Rept. 99–841, *supra* at II–187, 1986–3 C.B. (Vol. 4) at 187 (arm's-length price is evidence, although not conclusive evidence, of the stock's value[32]). However, prices obtained at forced sales, at public

---

[32] As an example of when the price of an arm's-length sale would be inappropriate to use to determine the value of the stock of a corporation, the conference report describes a purchase of a 20-percent block of stock, the price of which includes a control premium. Simply grossing up the purchase price of a 20-percent block would overstate the value of 100 percent of the stock

auctions, or in restricted markets may not be the best criteria of value, particularly when other evidence shows that the property would sell at a higher price under different circumstances. *McGuire v. Commissioner*, 44 T.C. 801, 808–809 (1965).

Although petitioner originally calculated the section 382 limitation using a value of $6.5 million, petitioner contends on brief that the value of the Teorco stock should not be limited to $6.5 million

because (i) the Teorco Stock was sold by Tosco to Petitioner in a restricted market, (ii) Tosco's sale of Teorco should be viewed as a forced bargain sale, and (iii) the record clearly establishes that the net fair market value of Teorco's assets was $11,909,865, and this value indicates that the value of the Teorco Stock was at least $11,909,865 rather than the distorted below-market value resulting from the forced auction sale of Teorco.

Tosco sent its bid solicitation letter to only about 20 companies. However, Tosco had targeted those companies after investigating which companies might be interested in buying Teorco. Market forces may have limited the number of potential buyers, but those same market forces set the value of the stock in Teorco. Unfortunately for Tosco, the market for oil-producing properties (including heavy-oil properties) was weak, as reflected by the paucity of responses to its request for bids.

There is no evidence that Bush knew there would be no other responsive bidders and that it therefore set its bid artificially low. Bush presumably set its bid as low as it thought it could and still acquire Teorco. Although there were no other bids that Tosco considered responsive, the bidding process was open, and Tosco reserved the right to reject any and all offers for Teorco.

Petitioner contends that Tosco's decision to sell Teorco should be viewed as a forced bargain sale, equating Tosco's business judgment that Teorco did not fit into its long-term business plan with the exigencies imposed by bankruptcy or foreclosure. Although Tosco wished to divest itself of Teorco, Tosco was not forced to do so. Tosco had alternative plans and access to the capital necessary to continue Teorco's busi-

---

of the corporation. The arm's-length sale price of Teorco, however, does not need to be grossed up because the price was for 100 percent of the stock of Teorco.

ness if it had not been sold. Tosco's decision to sell Teorco is not the equivalent of a sale imposed by outside forces.

Petitioner contends that the value of the stock of Teorco is "the net fair market value of Teorco's assets",[33] and not the price that Bush paid for the stock of Teorco. Although the underlying asset value may be significant, *Hamm v. Commissioner,* 325 F.2d 934, 941 (8th Cir. 1963), affg. T.C. Memo. 1961–347, a perceived risk of undisclosed and contingent liabilities depressed the fair market value of the Teorco stock,[34] see *Estate of Newhouse v. Commissioner,* 94 T.C. 193, 231–233 (1990); *Estate of Mueller v. Commissioner,* T.C. Memo. 1992–284. We find that the value of the stock of Teorco is more clearly shown by the price that Bush paid for 100 percent of that stock than by the value of the underlying assets. We therefore find that, immediately prior to the ownership change, the fair market value of the stock of Teorco was $6.5 million.

Tosco must have believed that $6.5 million was an adequate price for Teorco. Tenneco had offered Tosco $7.5 million to buy Placerita, but Tosco had rejected that offer. We do not believe that Tosco, as owner and fully informed seller of Teorco, would have accepted Bush's offer unless Tosco thought that avoiding the risks and burdens of potential liabilities (environmental and otherwise) outweighed the advantage of immediately receiving an additional $1 million.

Tenneco also appears to have thought that avoiding those risks and burdens justified an immediate expenditure of $1,250,000. Tenneco was willing to spend $7,750,000 to acquire Placerita but was not willing to accept McKittrick, Edison Grove, and Jasmin in addition to Placerita. Even though Placerita may have been worth $7,750,000 to Tenneco, Teorco as a whole was not.

There is nothing in the record to suggest that petitioner or Bush had access to any relevant facts that Tenneco or Tosco did not have. The unwillingness of either Tosco or Tenneco to accept the perceived risks and burdens associated with

---

[33] Petitioner defines the "net fair market value of Teorco's assets" as the gross value of Teorco's assets ($12,640,494) less the known liabilities ($535,569) and the reserve for unknown liabilities ($200,000).

[34] In addition to established State and Federal environmental laws and regulations, Proposition 65 was a significant departure from traditional environmental regulations, and although it was approved on Nov. 4, 1986, its key provisions did not take practical effect until 1988. Cal. Health & Safety Code secs. 25249.8(a), 25249.9(a), and 25249.10(b) (West 1992).

McKittrick, Edison Grove, and Jasmin indicates that those perceived risks and burdens reduced the value of Teorco as a whole. Both Tenneco and Tosco were willing, in effect, to pay Bush approximately $1 million to assume those risks and burdens.

In hindsight, petitioner's purchase of Teorco and the sale of Placerita were great deals. However, hindsight is 20/20, and the actions of the willing buyer and seller of Teorco have established that, at the time of the ownership change, the value of the stock of Teorco was $6.5 million.

### 5. *Redemption or Other Corporate Contraction—Section 382(e)(2)*

To limit bootstrap acquisitions of loss corporations' net operating loss carryovers, section 382(e)(2)[35] provides that the value of the old loss corporation (and therefore the amount of the section 382 limitation) is determined after taking into account any "redemption or other corporate contraction [that] occurs in connection with an ownership change". See H. Rept. 100–795, at 43 (1988); S. Rept. 100–445, at 45 (1988); H. Rept. 99–426, at 258 (1985), 1986–3 C.B. (Vol. 2) 1, 258 (ownership change effected by a redemption, which results in a contraction of the loss corporation's assets). A redemption or corporate contraction can occur in connection with an ownership change regardless of whether it occurs before or after the ownership change. H. Rept. 100–795, *supra* at 43; S. Rept. 100–445, *supra* at 45; H. Conf. Rept. 99–841, *supra* at II–187, 1986–3 C.B. (Vol. 4) at 187. Although section 382(e)(2), as enacted by TRA 1986, did not explicitly include "other corporate contraction", the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100–647, sec. 1006(d), 102 Stat. 3395, added that phrase to section 382(e)(2) for ownership changes after June 10, 1987.

The rule of section 382(e)(2) applies to a "redemption or *other* corporate contraction" (emphasis added). The focus of

---

[35] SEC. 382(e). VALUE OF OLD LOSS CORPORATION.—For purposes of this section—

(1) IN GENERAL.—Except as otherwise provided in this subsection, the value of the old loss corporation is the value of the stock of such corporation (including any stock described in section 1504(a)(4)) immediately before the ownership change.

(2) SPECIAL RULE IN THE CASE OF REDEMPTION OR OTHER CORPORATE CONTRACTION.—If a redemption or other corporate contraction occurs in connection with an ownership change, the value under paragraph (1) shall be determined after taking such redemption or other corporate contraction into account.

section 382(e) is on the value of the loss corporation, and the use of the adjective "other" indicates that a redemption is a corporate contraction. As a result, the term "corporate contraction" has a broader meaning than it had in the context of partial liquidations under the 1939 and 1954 Codes, in which the courts stressed the need for a curtailment of business activities.[36] It therefore follows that a distribution not amounting to a partial liquidation under prior law can be a corporate contraction under section 382(e)(2).

The example provided in the House and Senate reports that accompanied the amendment to section 382(e)(2) supports this interpretation of "corporate contraction":

[A] "bootstrap" acquisition, in which aggregate corporate value is directly or indirectly reduced or burdened by debt to provide funds to the old shareholders, could generally be subject to the provision. This may include cases in which debt used to pay the old shareholders remains an obligation of an acquisition corporation or an affiliate, where the acquired loss corporation is directly or indirectly the source of funds for repayment of the obligation. [H. Rept. 100–795, *supra* at 43; S. Rept. 100–445, *supra* at 45.]

The example focuses on reduction of the loss corporation's value by reason of its use as a source of funds in a bootstrap acquisition. It does not consider reduction of the loss corporation's business activities as such.

Respondent contends that the advances from C.J. Co. to Bush, which were subsequently distributed as a formal dividend to Bush by cancellation, were a "corporate contraction" because Bush never intended to repay them and that the advances therefore had no economic substance. Respondent contends further that the advances were made "in connection with the ownership change" because Bush would not have

---

[36] The term "corporate contraction" has been used to describe the "contraction of business operations" test of *Imler v. Commissioner,* 11 T.C. 836, 841 (1948). S. Rept. 1622, 83d Cong., 2d Sess. 49, 262 (1954); Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.07[2][b], at 9–52 (6th ed. 1994); see also Chommie, "Section 346(a)(2): The Contraction Theory", 11 Tax L. Rev. 407 (1956). The corporate contraction doctrine developed from cases deciding whether a distribution was a dividend under sec. 22(a), I.R.C. 1939, or a redemption in partial liquidation under sec. 115(g), I.R.C. 1939. Bittker & Eustice, *supra* par. 9.07[2][b], at 9–52.

Although a distribution did not need to be accompanied by a formal exchange of shares of the distributing corporation to qualify as a redemption, *Baan v. Commissioner,* 51 T.C. 1032, 1046 (1969) (actual surrender of shares is meaningless in a sole-shareholder situation), affd. 450 F.2d 198 (9th Cir. 1971), affd. sub nom. *Gordon v. Commissioner,* 424 F.2d 378 (2d Cir. 1970), it did need to be attributable to a contraction of the corporation's business in order to qualify as a partial liquidation, sec. 346(b)(1); *McCarthy v. Conley,* 341 F.2d 948, 952–955 (2d Cir. 1965); *Baan v. Commissioner, supra* at 1046–1047; *Fowler Hosiery Co. v. Commissioner,* 36 T.C. 201, 220 (1961), affd. 301 F.2d 394 (7th Cir. 1962).

needed to borrow substantial funds if it had not paid for Teorco with cash.

Petitioner contends that "corporate contraction" does not include loans or distributions between members of an affiliated group that files a consolidated return because such loans and distributions do not transfer equity value out of the affiliated group. Petitioner also contends that, if the canceled advances amounted to a corporate contraction, it did not occur in connection with the ownership change.

If we were to accept petitioner's contention that "corporate contraction" does not include distributions between members of an affiliated group, a corporation could acquire a loss corporation (without suffering a reduction in its value for the purposes of section 382) by causing the loss corporation to redeem some of its stock or pay a substantial dividend immediately after the ownership change and then use the proceeds of the distribution to pay the old shareholders. An acquisition so structured is the kind of bootstrap acquisition that section 382(e)(2) is intended to inhibit. Structuring the payment to the acquiror as a loan that is intended to be forgiven would reduce the loss corporation's assets in the same way as a redemption or formal dividend.

When a controlling shareholder withdraws funds from its controlled corporation, the relationship invites special scrutiny to determine whether the withdrawal is a bona fide loan, or a dividend at its inception or some later time. *Haber v. Commissioner,* 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970); *Bullock's Dept. Store, Inc. v. Commissioner,* T.C. Memo. 1973–249. This is a factual question, which depends in the first instance upon the shareholder's intent to repay at the time of the withdrawal, and the intention of the corporation to enforce collection. *Haber v. Commissioner, supra* at 266. The parties' intent must be inferred from all the facts and circumstances. *Estate of Chism v. Commissioner,* 322 F.2d 956 (9th Cir. 1963), affg. T.C. Memo. 1962–6; *Dean v. Commissioner,* 57 T.C. 32, 43 (1971).

When Bush received the advances from C.J. Co., Bush executed unsecured demand notes providing a market rate of interest. Although interest was paid monthly, no principal payment was ever demanded or made, and the advances were discharged by cancellation less than 6 months after the first payment and less than 3 months after the second pay-

ment. The cancellation so soon after the advances were made is strong evidence that, when C.J. Co. made the advances to Bush, neither Bush nor C.J. Co. intended them to be repaid.

Bush's financial position during 1987, 1988, and 1989, including its dwindling yearend cash balances ($10,709,990, $2,782,234, and ($32,939), respectively) and its obligations under the note to ABEG ($2,675,577) and the joint-venture agreement with Tenneco ($15.5 million), also indicate that Bush had no intention or ability to repay the advances from its own resources at the times they were received from C.J. Co.

Even if the advances standing alone did not amount to corporate contractions, C.J. Co.'s formal payment of a dividend by canceling the notes from Bush was a corporate contraction. C.J. Co.'s cancellation of the notes completed the process that the advances initiated, reimbursing Bush for a substantial portion of its investment in C.J. Co.

Because we find that Bush did not intend to repay the advances, and that these advances and their cancellation reduced the equity capital and value of C.J. Co., these events amounted to a corporate contraction. We must therefore determine whether the contraction occurred in connection with the ownership change.

Immediately prior to the ownership change, Bush had approximately $9 million of cash, which was sufficient to fund its projected operating losses for the next year, to pay off the $2,675,577 ABEG note, which a court had recently found to be in default, and to maintain a significant reserve. However, after purchasing Teorco, Bush had only approximately $3.4 million of cash, enough to pay off the ABEG note and to fund a few months of losses. The ownership change caused Bush to need a cash infusion, a need that was foreseeable in April 1988 and that would not have continued through March 1989 but for the acquisition of Teorco.[37] Bush's needs for cash were satisfied by the advances from C.J. Co., making the advances a direct and foreseeable result of Bush's acquisition of Teorco.

---

[37] Petitioner might have argued that the second advance was used to pay off the ABEG note, and not to finance the purchase of Teorco. However, money is fungible, and the ABEG note was an obligation of Bush that was due at the time of the ownership change. The ineluctable facts are that Bush was strapped for cash as a result of the ownership change, and that its coffers were replenished by the distributions from C.J. Co.

When Bush distributed the stock of C.J. Co. to petitioner, Bush still needed cash and was not in a position to repay the advances. We think that Bush's need for cash continued to be caused by its acquisition of Teorco, and that the advances were canceled in connection with the ownership change. Although the advances and the formal dividend in this case were not as closely connected to the ownership change as they would have been if a portion of the proceeds of the Placerita sale had been paid directly to Tosco, Bush would not have received or needed the funds represented by the advances if it had not acquired Teorco.

In *In re Kroy (Europe) Ltd.,* 27 F.3d 367 (9th Cir. 1994), the Court of Appeals for the Ninth Circuit, in addressing section 162(k), might be deemed to have interpreted "in connection with" more narrowly than we interpreted it in *Fort Howard Corp. v. Commissioner,* 103 T.C. 345, 352 (1994). However, the Court of Appeals for the Ninth Circuit has not taken a position on the interpretation of "in connection with" in the context of section 382, and we do not think "that it would be futile to decide this case as we think right." *Lardas v. Commissioner,* 99 T.C. 490, 498 (1992).

The question in the case at hand is not whether a concurrent expense was incurred in connection with a transaction, as in *In re Kroy,* but whether one transaction—the contraction of C.J. Co.—occurred in connection with a prior transaction—the ownership change of Teorco. In this case, Bush's need for cash and its ability to borrow from C.J. Co. had their origins in, and were connected causally with, Bush's acquisition of Teorco and C.J. Co.'s sale of Placerita. We conclude that the canceled advances occurred in connection with the ownership change for the purpose of section 382(e).

The value of Teorco is to be determined after taking into account the corporate contraction caused by the advances and their cancellation in the amount of $3,625,946.

### 6. *Substantial Nonbusiness Assets—Section 382(l)(4)*

To discourage "stuffing" a loss corporation with liquid assets or liquidating its active business assets before an ownership change, the value of the *old* loss corporation is reduced by the value of its nonbusiness assets (adjusted for their share of indebtedness), but only if the *new* loss corpora-

tion has substantial nonbusiness assets immediately after the ownership change. Sec. 382(l)(4)(A);[38] S. Rept. 99–313, at 233 (1986), 1986–3 C.B. (Vol. 3), 1, 233; H. Rept. 99–426, at 258–259 (1985), 1986–3 C.B. (Vol. 2) 1, 258–259; see also sec. 382(l)(1) (certain capital contributions not included in value).[39]

Although a loss corporation may be both the old loss corporation and the new loss corporation, it cannot be both at the same time. Sec. 382(k)(1), (2), and (3). Upon the ownership change, the old loss corporation becomes the new loss corporation.

The parties adopt opposing "all or nothing" approaches to the interpretation of section 382(l)(4). Petitioner asserts that section 382(l)(4)(A) does not become operative and that therefore the value of Teorco's stock is not reduced thereby. Respondent asserts that section 382(l)(4)(A) does operate and that the entire value of Teorco's stock is eliminated by its nonbusiness assets. Our approach leaves us standing on middle ground.

Petitioner asserts that "both the plain language of the statute and the legislative history indicate that the Section 382(l)(4) nonbusiness asset limitation only applies if the old

---

[38] SEC. 382(l). CERTAIN ADDITIONAL OPERATING RULES.—For purposes of this section—

\* \* \* \* \* \* \*

(4) REDUCTION IN VALUE WHERE SUBSTANTIAL NONBUSINESS ASSETS.—

(A) IN GENERAL.—If, immediately after an ownership change, the *new* loss corporation has substantial nonbusiness assets, the value of the *old* loss corporation shall be reduced by the excess (if any) of

(i) the fair market value of the nonbusiness assets of the *old* loss corporation, over

(ii) the nonbusiness asset share of indebtedness for which such corporation is liable.

(B) CORPORATION HAVING SUBSTANTIAL NONBUSINESS ASSETS.—For purposes of subparagraph (A)—

(i) IN GENERAL.—The *old* loss corporation shall be treated as having substantial nonbusiness assets if at least ⅓ of the value of the total assets of such corporation consists of nonbusiness assets.

\* \* \* \* \* \* \*

(C) NONBUSINESS ASSETS.—For the purposes of this paragraph, the term "nonbusiness assets" means assets held for investment.

[Emphasis added.]

[39] Although sec. 382(e)(1) defines the value of the old loss corporation "Except as otherwise provided in this *subsection*" (emphasis added), sec. 382(l)(4) also purports to reduce that value. To restrict reductions in the value of the old loss corporation to those provided in sec. 382(e) would render sec. 382(l)(4) superfluous, and would offend "the well-settled rule of statutory construction that all parts of a statute, if at all possible, are to be given effect." *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 633 (1973); *Woods v. Commissioner,* 91 T.C. 88, 98 (1988). We give effect to sec. 382(l)(4) by applying its provisions concurrently with sec. 382(e) to the value of the old loss corporation before multiplying the resulting value by the long-term tax-exempt rate. Sec. 382(b).

loss corporation has nonbusiness assets *prior to* the owner-ship change", and that "Section 382(l)(4) was enacted solely to prevent the *seller* of a loss corporation from liquidating the loss corporation's assets and then selling a shell corporation". Petitioner concludes that section 382(l)(4)(A) focuses solely on the assets of the old loss corporation, and that for section 382(l)(4) to apply, we must reorder the sequence of the purchase of the Teorco stock and the sale of Placerita. We disagree.

We do not find the language of section 382(l)(4) to be "plain"; it seems to us that the paragraph includes what might be taken to be conflicting references to "the new loss corporation" and "the old loss corporation".[40] The reduction in the value of the old loss corporation is triggered by the substantial nonbusiness assets of the *new* loss corporation, but the amount of the reduction is measured by the value of the nonbusiness assets of the *old* loss corporation. Sec. 382(l)(4)(A). In addition, "substantial nonbusiness assets" of the *new* loss corporation is defined by reference to the nonbusiness assets of the *old* loss corporation. Sec. 382(l)(4)(B)(i).

Although section 382(l)(4) is not a model of clarity, its focus does not appear to us to be solely on the assets of the old loss corporation, as petitioner contends. Section 382(l)(4)(A) uses the terms "old" and "new",[41] focusing on the assets of both the old loss corporation and the new loss corporation. H. Conf. Rept. 99–841, at II–190 (1986), 1986–3 C.B. (Vol. 4) 1, 190, supports this interpretation, referring to "a corporation's assets" and "the loss corporation", not merely to the old loss corporation.[42] Although in most cases neither

---

[40] Ginsburg & Levin, Mergers, Acquisitions, and Buyouts, sec. 1208.2.1.6, at 1121 n.167 (Jan. 1995), attribute the arguably conflicting references to a drafting error, and provide an example in which a literal application of sec. 382(l)(4) to a merger might well be deemed to reach an absurd result if the assets of the acquiring corporation are taken into account.

[41] Petitioner appears to be asking us to read "If, immediately after the ownership change, the new loss corporation has substantial nonbusiness assets" as "If, immediately before the ownership change, the old loss corporation has substantial nonbusiness assets". However, the use of two different terms draws an explicit distinction between them, *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 128 (1989) (Marshall, J., dissenting); *Norfolk S. Corp. v. Commissioner*, 104 T.C. 13, 40 n.30 (1995), and does not appear to lead us to absurd or futile results, *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 543 (1940); *Lenz v. Commissioner*, 101 T.C. 260, 265 (1993).

[42] Sec. 382, as it would have been amended by the House version of H.R. 3838, 99th Cong., 1st Sess. (House bill) sec. 321(a) (1985), would have provided that the value of the old loss corporation would be reduced if, immediately *after* an ownership change, the *old* loss corporation has substantial nonbusiness assets and that "the *old* loss corporation shall be treated as having

the value nor the character of the loss corporation's assets will change when the loss corporation is the subject of an ownership change, in this case Placerita was changed from a business asset to a nonbusiness asset when Bush purchased the Teorco stock, and, pursuant to prearrangement, caused C.J. Co. to sell Placerita to Tenneco.[43]

Nonbusiness assets are defined as "assets held for investment". Sec. 382(l)(4)(C). H. Conf. Rept. 99–841, *supra* at II–190, 1986–3 C.B. (Vol. 4) at 190, states that assets held for investment include cash and marketable securities that are not held as an integral part of the conduct of a trade or business, and the report cites the reserves of an insurance company or bank as examples of cash and securities held as an integral part of the business.

The definition of nonbusiness assets that was finally enacted is considerably less specific than the definition included in the House bill, which included:

(i) cash,
(ii) marketable stocks or securities, and
(iii) any other asset which is—
(I) not held for active use in a trade or business, or
(II) disposed of (other than in the ordinary course of the old loss corporation's trade or business) pursuant to a plan or arrangement in existence before * * * [the ownership change].
[House bill sec. 321(a).]

The amendments to H.R. 3838 that were proposed in the Senate, H.R. 3838, 99th Cong., 2d Sess. (1986), struck out the reduced-value provisions of the House bill and completely disallowed net operating loss carryovers if, immediately prior to the ownership change, at least two-thirds of the old loss company's assets were held for investment. Although the Senate bill disregarded stock and securities of a subsidiary, it did not otherwise specify what types of assets were to be considered as held for investment.

Respondent cites the House report on the House bill, H. Rept. 99–426, *supra* at 269–270, 1986–3 C.B. (Vol. 2) at 269–

---

substantial nonbusiness assets if at least ⅓ of the value of the total assets of such corporation consists of nonbusiness assets." House bill sec. 321(a). Although the House bill consistently used the term "old loss corporation", the test was to be applied immediately *after* the ownership change, when the loss corporation would have become the new loss corporation.

[43] The change in character of Placerita was a direct result of the process of acquisition, and Teorco/C.J. Co.'s assets remained isolated from Bush's assets. Cf. Ginsburg & Levin, *supra* sec. 1208.2.1.6, at 1121 n.167.

270, for the proposition that "assets held for investment" includes assets disposed of pursuant to a plan. Petitioner, on the other hand, notes that the language of that report reflects the intent of the House, not the Senate. Neither party seems to recognize that the language of the House bill was not included in the law as enacted.

We think Congress recognized that it could not foresee all the ways that transactions could be structured, and that, to prevent avoidance of the mechanical rules of section 382(b), Congress provided a flexible, general definition of nonbusiness assets. We interpret the definition of nonbusiness assets so as to implement the antiavoidance purpose of section 382(l)(4). See H. Conf. Rept. 99–841, *supra* at II–172, 1986–3 C.B. (Vol. 4) at 172.

Neither petitioner, Bush, nor C.J. Co. was ever interested in acquiring or retaining Placerita and the benefits associated with its operation, nor was any of them ever at risk with respect thereto. C.J. Co. did not earn any income or incur any expenses with respect to the operation of Placerita. C.J. Co. never had an operating interest in Placerita because it was immediately bound, through Bush's commitment, to sell Placerita to Tenneco upon Tosco's sale of Teorco to Bush.[44] We see no practical difference between a corporation's acquiring a corporation that has converted its business assets to investment assets before being sold, and an acquiring corporation's obligating itself, before it contracts to purchase the acquired corporation, to convert those business assets to investment assets immediately after it acquires control of them.

As petitioner contends, "it can hardly be said that Petitioner converted Teorco's operating assets to nonbusiness assets * * * *and then* sold the stock of Teorco as a corporate shell". What can be said, however, is that petitioner bound

---

[44] Petitioner's reply brief (contrary to petitioner's opening brief) asserts that, pursuant to sec. 1.382–2T(h)(4)(i), Temporary Income Tax Regs., 52 Fed. Reg. 29684 (Aug. 11, 1987), Teorco's ownership change occurred on Feb. 26, 1988, 2 months before Placerita was sold. Petitioner asserts that Bush's acceptance letter dated Feb. 26, 1988, created an option pursuant to sec. 1.382–2T(h)(4)(v), Temporary Income Tax Regs., 52 Fed. Reg. 29684 (Aug. 11, 1987). Petitioner's assertions ignore two facts: First, on its 1988 corporate income tax return, petitioner elected to use the date that the constructive option was exercised, Apr. 30, 1988, as the date of the ownership change, see sec. 1.382–2T(h)(4)(vi)(B), Temporary Income Tax Regs., 52 Fed. Reg. 29684 (Aug. 11, 1987); and second, even if Berry had not elected Apr. 30, 1988, as the date of the ownership change, on Feb. 18, 1988, 8 days before the option was created, Bush had agreed to cause Teorco to sell Placerita to Tenneco if Bush should be successful in acquiring Teorco.

itself to convert Teorco's most important business asset to a nonbusiness asset, purchased the stock of Teorco, and then effected the conversion pursuant to the preexisting, binding obligation.

We look to the definition of "immediately after" as that phrase is used in the regulations under section 351 as "a situation where the rights of the parties have been previously defined and the execution of the agreement proceeds with an expedition consistent with orderly procedure." Sec. 1.351–1(a)(1), Income Tax Regs. Momentary ownership of what might otherwise be a business asset is insufficient where the owner's rights and obligations with respect to that asset have been previously defined, and must be subsequently carried out, pursuant to a prearrangement, in this case, an agreement whose enforceability was triggered by the ownership change. See *Culligan Water Conditioning, Inc. v. United States,* 567 F.2d 867, 869 (9th Cir. 1978) (applying sec. 351); *Intermountain Lumber Co. v. Commissioner,* 65 T.C. 1025 (1976) (applying sec. 351); sec. 1.351–1(a)(1), Income Tax Regs.

We stress that the Teorco and Placerita transactions made good business sense, regardless of the net operating loss carryovers. As respondent has conceded, petitioner did not arrange those transactions with the principal purpose of evading or avoiding Federal income tax. See sec. 269(a). However, immediately after the ownership change, C.J. Co. held Placerita as the functional equivalent of the cash proceeds from its impending sale.

Petitioner, assuming for the sake of argument that we might reorder the purchase of Teorco's stock and the sale of Placerita and treat the cash proceeds from the Placerita sale as assets of Teorco (we have not done so), asserts that Congress did not intend cash and marketable securities to be per se nonbusiness assets, and suggests that we adopt a "reasonable needs of the business" test similar to section 537. We agree that, when cash and marketable securities are held as an integral part of the taxpayer's business, they will not be characterized as nonbusiness assets. H. Conf. Rept. 99–841, *supra* at II–190, 1986–3 C.B. (Vol. 4) at 190. However, considering that the examples cited in H. Conf. Rept. 99–841 (insurance company and bank reserves) are reserves required by law, we think that Congress intended a more stringent

test of need.[45] *Id.* Although future acquisitions and other business needs of a subsidiary's parent may be reasonable needs for the subsidiary to hold cash under section 537, see secs. 1.537–1(a)(2), 1.537–3, Income Tax Regs., we find that neither Placerita nor the proceeds of its sale was an integral part of C.J. Co.'s heavy-oil business immediately after the ownership change.[46]

The Jasmin receivable was also a nonbusiness asset. The primary purpose of section 382(l)(4) is to discourage the conversion of a loss corporation's active business assets into passive assets prior to a change in ownership of the corporation. S. Rept. 99–313, at 233 (1986), 1986–3 C.B. (Vol. 3) 1, 233; H. Rept. 99–426, at 258–259 (1985), 1986–3 C.B. (Vol. 2), 1, 258–59. The Jasmin receivable was created as part of just such a transaction, and resulted, prior to the ownership change, in the conversion of one of Teorco's business assets into a passive investment asset.

Placerita and the Jasmin receivable were nonbusiness assets immediately after the ownership change, and therefore C.J. Co. had substantial nonbusiness assets immediately after the ownership change.[47] Because C.J. Co. had substantial nonbusiness assets immediately after the ownership change, the value of Teorco immediately prior to the ownership change must be reduced by the value of the nonbusiness assets owned by Teorco immediately prior to the ownership change.

Although immediately after the ownership change C.J. Co. held Placerita as a nonbusiness asset, immediately prior to the ownership change, Teorco held Placerita as a business asset.[48] Teorco, unlike C.J. Co., had earned income and

---

[45] This more stringent test is tempered by a relatively high ceiling of allowable nonbusiness assets (one-third of gross assets) before sec. 382(l)(4) will be triggered. This ceiling effectively exempts reasonable amounts of working capital.

[46] We note that petitioner did not even attempt to carry the burden of showing its reasonable business needs under the "reasonable needs of the business" test that it suggested.

[47] Although sec. 382(l)(4)(A) tests the nonbusiness assets of the *new* loss corporation, sec. 382(l)(4)(B)(i) provides that "The *old* loss corporation shall be treated as having substantial nonbusiness assets if at least ⅓ of the value of the total assets of such corporation consists of nonbusiness assets." (Emphasis added.) Over 70 percent (($7,750,000 + $1,588,155) ÷ $12,640,494) of the value of C.J. Co.'s assets consisted of nonbusiness assets, and we find that percentage to be substantial without recourse to sec. 382(l)(4)(B)(i).

[48] Although Teorco and C.J. Co. are the same corporation, sec. 382 establishes a clear distinction between the old loss corporation and the new loss corporation. Because Teorco's entire ownership and management were displaced, we treat Teorco and C.J. Co. as different entities, C.J. Co. being successor to Teorco's property but not to the character of that property. See *Estate of Ferber v. Commissioner,* 22 T.C. 261 (1954) (decedent's inventory became a capital asset when

incurred expenses with respect to Placerita. We do not impute Bush's or C.J. Co.'s intent or contractual obligation to sell Placerita to Tosco or Teorco because neither Tosco nor Teorco was a party to the Placerita agreement or any other agreement for the sale of Placerita. Tosco and Teorco were not interested in selling Placerita. Neither Tosco nor Teorco was obligated to convert Placerita to cash, and the sale of Teorco to Bush was not dependent on Bush's being able to sell Placerita. Because Placerita was not a nonbusiness asset of Teorco immediately prior to the ownership change, the value of Teorco immediately prior to the ownership change is not reduced by the value of Placerita.[49]

Because Placerita was a nonbusiness asset immediately after the ownership change, it triggers section 382(l)(4).[50] However, because Placerita was not a nonbusiness asset immediately before the ownership change, it does not reduce the value of Teorco immediately before the ownership change for the purposes of section 382. The only nonbusiness asset that Teorco held immediately before the ownership change was the Jasmin note receivable, which had a value of $1,588,155. Therefore, for the purposes of section 382, the value of Teorco immediately before the ownership change, $6,500,000, must be reduced by $1,520,866 ($1,588,155 − (($1,588,155 ÷ $12,640,494) × $535,569)), the amount by which value of the Jasmin note receivable exceeds its proportionate share of the $535,569 of debt for which Teorco was liable. Sec. 382(l)(4)(A)(i) and (ii).

The amount of petitioner's section 382 limitation with respect to C.J. Co. will be calculated using a "value of the old

---

acquired by his estate).

[49] The facts of this case are in contrast to a situation in which, although there is an ownership change, the management of the loss corporation remains the same, the old loss corporation is involved in the arrangements to sell off its assets, or the principal purpose of the acquisition was to evade or avoid Federal income tax.

[50] The Jasmin receivable alone is insufficient to trigger the application of sec. 382(l)(4). Immediately before and after the ownership change, the value of the Jasmin receivable was only one-eighth ($1,588,155 ÷ $12,640,494) of the value of the Teorco/C.J. Co.'s total assets, and less than one-third ($1,588,155 ÷ $6,500,000) of the value of the stock.

loss corporation" of $1,353,188 ($6,500,000 – $3,625,946 – $1,520,866) and a "long-term tax-exempt rate" of 7.47 percent.

*Decision will be entered under Rule 155.*